## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CHARLES RAWLINGS, et al.,** | * | |
| **Plaintiffs,** | * | |
| **vs.** | | **Civil Action No. 07-001914 (PLF)** |
| | * | |
| **THE DISTRICT OF COLUMBIA, et al.,** | * | |
| | * | |
| **Defendants.** | | |
| | * | |

### PLAINTIFFS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO STAY PROCEEDINGS OR, IN THE ALTERNATIVE, FOR A PROTECTIVE ORDER STAYING DISCOVERY

Come now the plaintiffs, by and through counsel, and hereby submit their opposition to the outrageously bogus motion to stay proceedings or alternatively for a protective order staying discovery, until resolution of an allegedly pending criminal investigation, that has been filed defendant District of Columbia.

## I. INTRODUCTION

The motion filed by the District of Columbia is somewhat odd given that the Federal Rules of Civil Procedure requires that a defendant file an answer to a complaint within twenty (20) days. F.R.C.P. 12(a)(1)(A). The Rules allow for a motion to be filed in lieu of an answer only if that motion is filed pursuant to Rule 12(b). Clearly, a motion to stay all proceedings does not fall within the parameters of any of the specified subjects set forth in F.R.C.P. 12(b) (1-7). The District of Columbia, which was served with the summons and complaint in this matter on November 7, 2007, is technically in default. And while the plaintiff has yet to move for a default, this matter is not at issue since no answer has been filed. In any event, it is indeed strange that the District of Columbia

would ignore its obligations under the Rules while it seeks assistance from the Court presumably under those very same Rules.

In any event, the District's motion is entirely without, and to be sure, in what has become far too routine in cases in which the District is involved, the Rules are all but ignored. Obstruct discovery by any means necessary is clearly the objective. Indefensible case, obstruct discovery. Bad facts, obstruct discovery. Unlikely to succeed on the merits, delay, delay delay. Unless and until a court sends a message that this routinely obstinate conduct will not be tolerated, it will persist. As the Court will see below, the obstinance of the District of Columbia is on full display herein.[1]

1. **Request for Stay of Proceeding**

The District seems to be suggesting to this Court that the stay of proceedings that it seeks is fairly routine. Nothing could be farther from the truth. In none of the following cases, each of which involved a death (with the exception of the Deng case), was a stay entered:

- Harris v. D.C., Case No. 99-CV-2917 (Judge Kotelly), no stay, all discovery completed, all reports provided;

- Shorter v. D.C., Case No. 00-657 (Judge Roberts), no stay, all discovery completed, all reports provided;

- Barnes v. D.C., Case No. 02-485 (Judge Collyer), no stay, all discovery completed, all reports provided;

- Hundley v. D.C., Case No. 02-0638 (Judge Kennedy), motion for stay denied, all discovery completed, all records provided;

---

[1] Incredulously, counsel for the District, who admit that they do not represent the individual officers who are named in this lawsuit, and offer no assurances to the Court that they will be representing those officers, inform the Court, without any supporting authorities of any kind or logic, that it may take into the consideration the "interests" of those officers as it decides this matter. This reasoning is particularly confusing since the Court has no information about the officers' "interests." The only defendant whose interests the District's counsel are able to competently advance are the interests of the District of Columbia.

- Deng v. D.C., Case No. 02-2022 (Judge Collyer), no stay, all discovery completed, all reports provided;

- Emanuel v. D.C., Case No. 03-1186 (Judge Huvelle), motion for stay denied, all discovery completed, all records provided;

- Reed v. D.C., Case No. 03-1085 (Judge Collyer), motion for stay denied, all discovery completed, all records provided.

It is of great significance that in none of the cases listed above, were any records withheld and it is even more noteworthy that the U.S. Attorney's Office had no issue with the investigative materials being released, just as AUSA John Cummings has indicated that he takes no position regarding release of the FIT Report in this case by the District.

In an attempt to support its position, nonetheless, the District references *Johnson v. District of Columbia et al*., C.A. No. 02-1452 (RMC). Interestingly, that is a case wherein undersigned counsel represented the plaintiff, and contrary to the District's suggestion, Judge Collyer did not grant a stay in that case. Judge Collyer in fact, did not rule on the motion and allowed the discovery that the plaintiff requested to proceed. Judge Collyer specifically noted that the "District of Columbia may renew the Motion to Stay All Proceedings . . ." Collyer order at 4.

Next, the District of Columbia references *Henderson v. District of Columbia*, C.A. No. 06-947 wherein Judge Kennedy entered a minute order granting an unopposed motion to stay. The only thing noteworthy about the *Henderson* case is the fact that the identical motion filed here, almost word for word, was filed in that case as well. Exhibit 1.

Furthermore, none of the cases cited by the District are even remotely applicable to the facts here. For example, the Founding Church of Scientology case dealt with a motion to compel answers to interrogatories, the interrogatories sought information regarding investigative techniques,

surveillance, and informants used by the defendants.  <u>Founding Church of Scientology v. Kelly</u>, 77

F.R.D. 378, 379 (D.D.C. 1977).  In denying plaintiff Founding Church of Scientology's motion to

compel, the trial court noted that a criminal grand jury was investigating the plaintiff, and made clear

that

> It is well established that a litigant should not be allowed to make use of the liberal
> discovery procedures applicable to a civil suit to avoid the restrictions on criminal
> discovery and, thereby, obtain documents he might not otherwise be entitled to for
> use in his criminal suit. [citations omitted.]

<u>Id.</u> at 380.

The District further claims that there is an ongoing criminal investigation being conducted

by the U.S. Attorney's Office.  That is not entirely accurate.  The defendant officers were involved

in a police action wherein the plaintiff's decedent was shot in the back of the head by one of those

officers and killed.  Consequently, an investigation was conducted by the Force Investigation Team

("FIT") of the Metropolitan Police Department.

> MPD created the Force Investigation Team (FIT) to conduct fair, impartial and
> professional reviews of firearm discharges,

Memorandum of Agreement ("MOA") between DOJ and MPD dated June 13, 2001, at ¶ 56, pg. 9.

Exhibit 2.[2]

> FIT shall respond to the scene of any incident involving deadly force, a serious use
> of force, or any use of force indicating potential criminal misconduct by an officer.
> In each of these incidents, FIT shall conduct the investigation of the use of force.

MOA at ¶ 61, pg. 10.

---

[2]/ This agreement is effectuated pursuant to the authority granted DOJ under the Violent
Crime Control and Law Enforcement Act of 1994 (42 U.S.C. § 14141) to seek declaratory or
equitable relief to remedy a pattern or practice of conduct by law enforcement officers that
deprive individuals of rights, privilege or immunities secured by federal law.  MOA at ¶ 4, pg. 3.

With regard to the investigation itself

> MPD shall consult with the USAO regarding the investigation of an incident involving deadly force, a serious use of force, or any other force indicating potential criminal misconduct by an officer.  If the USAO indicates a desire to proceed criminally based on the on-going consultation with MPD, or MPD requests criminal prosecution in these incidents, any compelled interview of the officer shall be delayed . . .

MOA at ¶ 58, pg. 9.

And finally it is noted that

> In every incident involving deadly force, a serious use of force, or any use of force indicating potential criminal misconduct by an officer, the USAO shall notify and consult with the Chief of Police or the appropriate OPR official whenever possible . . .

MOA ¶ 59, pg. 9.

With respect to the above-referenced MOA , Charles Ramsey, the then Chief of Police identified it as follows:

> The MOA, or Memorandum of Agreement, is a binding contract entered into by the City, the MPD, and the DOJ.  It sets forth a series of policies, procedures, and practices that must be implemented by the MPD and the City relating to, among other things, the use of force and handling of investigations relating to the use of force.

MOA at 3.

As is clear from the excerpts from the MOA referenced above, all serious uses of force and discharges of weapons are investigated by MPD's FIT, and all instances of deadly force are referred to the U.S. Attorney's Office for review and consultation.  This is done as a matter of course as part of the City's agreement with DOJ stemming from MPD's undisputed practices and policies of deprivations of rights, privileges or immunities secured by federal law.

There is positively no basis for the contention that a criminal investigation is ongoing.

-5-

Moreover, the contention that the defendants cannot "Mount an effective defense without its officers' cooperation and/or testimony" Mot. Mem. at 4, is pure nonsense. The Metropolitan Police Department is the law enforcement agency that is conducting the subject investigation of the shooting. The two lead officers are Sgt. Ralph Wax and Det. Arthur Leech. The defendant officers have already provided at least two(2) statements, and all of the physical evidence has already been identified and gathered and is in the exclusive possession of the District of Columbia. As to the assertion in the District's "canned" motion that "the District cannot require an officer to speak about the incident if the U.S. Attorney's Office has not issued a written criminal declination, Mot. Mem. at 4, the District is making it up as it goes along. The MOA does not even come close saying what the District represents that it does.

The District, in invoking the provisions of the MOA, overlooks ¶ 53 of that document which requires that any officer using deadly force must immediately report such incident to his/her supervisor and complete a Use of Force Incident Report. To be sure, the District's position is clearly meritless in this regard. Undersigned counsel has been involved in numerous police shooting cases and has always been able to conduct and obtain all MPD documents. The fact of the matter is that incidents involving deadly or serious uses of force are investigated by the U.S. Attorney and in none of those cases does a legitimate basis for staying discovery exist.

In this particular case, the best the defendants can do is submit an alleged Declaration of Ronald B. Harris, Deputy General Counsel for the Metropolitan Police Department that does nothing if not substantiate the absurdity of the defendants' position. First of all, the Declaration of Ronald B. Harris is identical to the Declaration filed in support of the District's Motion to Stay in *Henderson.* Exhibit 3. Secondly, the alleged Declaration of Ronald B. Harris is devoid of his

signature.  But most importantly, the Declaration of Ronald B. Harris provides no information whatsoever as to how he has any personal knowledge of any of the statements attributed to him.  For instance, Mr. Harris cannot know what, if anything, any grand jury is investigating.  Equally compelling is the fact that according to the MOA ¶ 58, the U.S. Attorney's Office:

> shall respond to a written request by MPD for charges, declination or prosecutorial opinion within three business days, by either filing charges, providing a letter of declination, or indicating the USAO's intention to continue further criminal investigation.

*Id.*  Mr. Harris fails to indicate that MPD has made a request for charges or that the U.S. Attorney's Office has put anything in writing regarding its intention in the shooting death of DeOnte Rawlings. In other words, the Declaration of Mr. Harris, which the District appears to think is interchangeable from case to case, is entirely without credible substance.

Mr. Harris further submits that "while this matter is under criminal investigation by the grand jury and the Office of the United States Attorney for the District of Columbia, MPD cannot release any information or documents associated with the incident without compromising the investigation." Harris Decl. at ¶ 5.  Mr. Harris fails to explain how providing the photographs of the scene would compromise an investigation; Mr. Harris fails to explain how providing the radio communication prior to and after the shooting would compromise an investigation.  In fact, Mr. Harris fails to explain how providing any information to the plaintiff regarding the shooting, pursuant to a protective order, would compromise any investigation.  Truth be told, Mr. Harris does not explain a thing, all he does is suggest that the law enforcement privilege applies in this case.

In *Kay v. Pick*, 711 A.2d 1251 (D.C. 1998), the D.C. Court of Appeals made clear that the nonsense presented here is unacceptable to invoke the law enforcement privilege:

The party claiming the privilege must have "[1] seen and considered the contents of the documents and [2] himself formed the view that on the grounds of public interest, they ought not be provided, [3] state with specificity the rationale of the claimed privilege [namely 3(a)] specifying which documents or class of documents are privilege and [3(b)] for what reasons." [Citation omitted.]

*Id.* at 1256. Mr. Harris clearly does not comply with the above requirements.

In sum, no basis for a stay of proceedings exists and the Declaration of Ronald B. Harris, which the District seems to believe it can file in any case that it seeks a stay with or without his signature, provides little or no support to the District's cause.

## 2. **Protective Order**

The District alternatively wants the Court to enter a protective order staying discovery. Obviously, that would not be fair since the District has the discovery that the plaintiff would be seeking, The District has the contemporaneous statements of witnesses, and all of the physical evidence. What the District is proposing is simply unfair. The plaintiffs are stymied in their quest for leads - the District is not. The plaintiffs are hamstrung by their inability to examine and assess the physical evidence - the District is not. The plaintiffs are unable to make inquiries of witnesses when things are fresh in their minds, based upon the physical evidence gathered - whereas the District is not so constrained. A stay of discovery is an unfair advantage being sought by the District.

Even though the District cites *Gordon v. Federal Deposit Ins. Corp.*, 427 F.2d 578, 580 (D.C. Cir. 1990)) as somehow supporting its position, that simply is not the case:

There may be cases where the requirement that a criminal defendant participate in a civil action, at peril of being denied some portion of his worldly goods, violates concepts of elementary fairness in view of the defendant's position in an inter-related criminal prosecution. On the other hand, the fact that a man is indicted cannot give him a blank check to block all civil litigation on the same or related underlying subject matter. Justice is meted out in both civil and criminal litigation. The overall interest of the courts that justice be done may very well require that the compensation

and remedy due a civil plaintiff should not be delayed (and possibly denied). The court, in its sound discretion, must assess and balance the nature and substantiality of the injuries claimed on either side.

*Id.* This language says it all. Staying discovery would be manifestly unfair to the plaintiffs and especially to DeOnte Rawlings, the victim in this case, and the victim in any alleged prosecution. DeOnte Rawlings is the victim, not the District and not the defendant officers. DeOnte Rawlings and his parents are entitled to justice, and staying discovery does not advance the cause of justice insofar as he and/or his parents are concerned.

Wherefore, for the reasons stated herein and in the record of this proceeding and because the defendants' motion is both meritless and disingenuous and because civil cases are routinely litigated in this Court under similar circumstances, it is respectfully submitted that the defendants' motion should be summarily denied.

Respectfully submitted,

Gregory L. Lattimer [371926]
1100 H Street, N.W.
Suite 920
Washington, D.C. 20005
(202) 638-0095
Attorney for the Plaintiffs

-9-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TAKAISHA HENDERSON, )
 )
  Plaintiff, )
 )
  v. ) Civil Action No. 06-00947 (HHK)
 )
DISTRICT OF COLUMBIA, *et al.*, )
 )
  Defendants. )
 )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT DISTRICT OF COLUMBIA'S MOTION TO STAY PROCEEDINGS OR, IN THE ALTERNATIVE, FOR A PROTECTIVE ORDER STAYING DISCOVERY

I. INTRODUCTION

Plaintiffs allege numerous statutory and constitutional violations resulting from the February 22, 2006 lethal shooting of the decedent, Ignatius Brown, by an off-duty Metropolitan Police Department ("MPD") officer.

On June 27, 2006, this Court granted the District of Columbia an extension of time to respond to the complaint. Since that time, undersigned counsel discovered that a grand jury and the United States Attorney's office is conducting a criminal investigation of the shooting, *Exhibit #1, Affidavit of Ronald B. Harris.* At this time, the District of Columbia has not answered the complaint, and no scheduling order has been entered. Moreover, the Plaintiffs have not served the individual Defendant.

In light of the pending criminal investigation, the District of Columbia respectfully requests a stay of proceedings, or alternatively a stay of discovery, until resolution of the



criminal investigation. A stay would protect the Defendant police officer[3] from prejudice that could result from overlapping criminal and civil proceedings, prevent the necessity of the parties moving forward without having complete access to relevant information, prevent compromise of the criminal investigation, enhance judicial economy, and protect the public interest.

## II.    ARGUMENT

"[A] court may decide in its discretion to stay civil proceedings, postpone civil discovery, or impose protective orders or conditions 'when the interests of justice seem to require such action.'" Securities and Exchange Comm'n v. Dresser Indus., Inc., 628 F.2d 1368, 1375-76 (D.C. Cir. 1980), quoting United States v. Kordel, 397 U.S. 1, 12 n.27 (1970) (alterations omitted). Generally, "the strongest case for deferring civil proceedings until after completion of criminal proceedings is where a party under indictment for a serious offense is required to defend a civil or administrative action involving the same matter." Dresser, 628 F.2d at 1375-76.

Courts have recognized the severe prejudice to a defendant simultaneously facing related criminal and civil proceedings. If the pending civil action is not stayed, then those civil proceedings could well "undermine the party's Fifth Amendment privilege against self-incrimination, expand the rights of criminal discovery beyond the limits of [criminal procedure], expose the basis of the defense to the prosecution in advance of criminal trial, or otherwise prejudice the case." Id. at 1376. "When a defendant has been indicted, his situation is particularly dangerous . . . for the risk to his liberty, the importance of safeguarding his constitutional rights, and even the strain on his resources and attention that makes defending

---

[3]    Although Defendant Ford is not represented by undersigned counsel in this matter as he has not been served, the Court may still consider his interest in a stay of this matter.

2

satellite civil litigation particularly difficult, all weigh in favor of his interest." Sterling Nat'l
Bank v. A-1 Hotels Int'l, Inc., 175 F. Supp. 2d 573, 577 (S.D.N.Y. 2001).

To prevent such prejudice, federal courts have stayed civil proceedings until the
conclusion of overlapping criminal proceedings against the same defendant. See Doe v. City of
Chicago, 360 F. Supp. 2d 880 (N.D. Ill. 2005) (granting stay where defendant officer criminally
charged for misconduct arising out of the same events underlying plaintiff's civil lawsuit); Cruz
v. County of DuPage, 1997 U.S. Dist. LEXIS 9220, No. 96 C 7170, 1997 WL 370194, at *4
(N.D. Ill. June 27, 1997) (granting stay of all discovery in a civil case against defendants
"because there is a distinct possibility that the parallel proceedings would undercut the
defendants' privileges against self-incrimination"); Volmar Distributors, Inc. v. New York Post
Co., Inc., 152 F.R.D. 36, 39 (S.D.N.Y. 1993) (finding that defendants "have a real and
immediate interest in staying discovery" because an indictment based on the same factual
background was currently pending against them).

"The fact that an indictment has not yet been returned – while it may be a factor
counseling against a stay of civil proceedings – does not make consideration of the stay motion
any less appropriate." Brock v. Tulkow, 109 F.R.D. 116 (E.D.N.Y. 1985) (granting stay of
discovery pending outcome of criminal investigation); see Jones v. City of Indianapolis, 216
F.R.D. 440, 451-52 (S.D. Ind. 2003) (finding a limited stay of discovery "reasonable and
appropriate" to protect the defendant officers' Fifth Amendment rights in the event that pending
criminal investigation later resulted in indictments); Walsh Securities, Inc. v. Cristo Property
Mngmt., Ltd., 7 F. Supp. 2d 523, 529 (D.N.J. 1998) (although no criminal indictment yet
returned, "the strong potential for an unjust result" warranted stay to prevent prejudice to
defendants and to uphold their Fifth Amendment rights); Founding Church of Scientology v.

3

Kelley, 77 F.R.D. 378, 380 n. 4 (D.D.C. 1977) (noting that the appropriateness of a stay is not limited "only to persons after they become a 'defendant.'").

In determining whether to stay an action, this Court "must balance the competing interests of the parties." Ellsberg v. Mitchell, 353 F. Supp. 515, 517 (D.D.C. 1973), citing Landis v. North American Co., 299 U.S. 248, 254-55 (1935) and Dellinger v. Mitchell, 442 F.2d 782, 786, 787 (D.C. Cir. 1971). The issuance of a stay "would require not only a showing of 'need' in terms of protecting the other litigation involved but would also require a balanced finding that such need overrides the injury to the parties being stayed." Dellinger, 442 A.2d at 787. The initial burden is on the party applying for the stay "to demonstrate a need, however slight, which justifies a delay in the proceedings." Ellsberg, 353 F. Supp. at 517 (emphasis added).

In this case, a limited stay of proceedings is appropriate to prevent severe prejudice to defendants. Proceeding immediately with this civil action, while an active criminal investigation is nearing conclusion, would force the Defendant police officer into the difficult choice of waiving potential Fifth Amendment privileges or effectively forfeiting the civil suit. The District of Columbia is equally prejudiced because the District cannot mount an effective defense without its officer's cooperation and/or testimony. Under the terms of the 2001 Memorandum of Agreement between the U.S. Department of Justice and the District of Columbia (MOA), for example, the District cannot require an officer to speak about the incident if the U.S. Attorney's Office has not issued a written criminal declination. Thus, the District cannot interview the individual officer or complete its own internal investigation of the officers' alleged misconduct until at least the conclusion of the criminal investigation. See also Volmar Distributors, 152 F.R.D. at 40-42 (granting stay as to all defendants where stay appropriate as to two defendants

who were "central figures" in the case). The requested stay would also avoid unnecessary compromise of the criminal investigation resulting from untimely disclosure of sensitive information and documents.

Moreover, a stay has the potential to conserve the parties' resources and enhance judicial efficiency. If the U.S. Attorney's Office issues a letter of declination upon completion of its investigation, the MPD can promptly complete its own internal investigation, which must occur within ninety days thereafter. (See Exh. A, MOA ¶ 61, 74). Both the District of Columbia and the plaintiff would benefit from a completed internal investigation to guide these proceedings at the outset, especially with respect to discovery and the feasibility of early settlement discussions.

The public interest is one additional consideration that supports the issuance of a stay. Because this civil case is a private action for money damages, the public has no real stake in its outcome. Cf. Dresser, 628 F.2d at 1380 (finding public interest in protecting investors and securities markets was served by parallel SEC criminal and civil enforcement proceedings). Plaintiff makes no request for equitable relief or any allegation that the alleged harm is ongoing. The relevant public interest in the prosecution of those responsible for criminal misconduct is fully served by the ongoing criminal investigation. The pending civil action would not benefit that criminal investigation and even runs the risk of interfering with the investigation by, for example, discouraging reluctant witnesses to come forward. See Tuite v. Henry, 98 F.3d 1411, 1417 (D.C. Cir. 1996) (noting factor supporting law enforcement investigatory privilege is whether release of information would "discourage citizens from giving the government information"); Jones, 216 F.R.D. 440, 445-46 (upholding law enforcement investigatory privilege in civil rights action based on potential chilling effect on witnesses). Therefore, the public interest supports a stay in this case.

As a result of the balancing of all the interests involved, the District of Columbia submits

that this action should be stayed until the United States Attorney's criminal investigation is

completed. Even assuming that a stay of proceedings is not warranted, a sound exercise of this

Court's discretion, alternatively, would be to enter a protective order staying discovery. See

Gordon v. Federal Deposit Ins. Corp., 427 F.2d 578, 580 (D.C. Cir. 1970) (stating that, in light

of a pending criminal investigation, "the fact the civil case is not stayed does not mean that

discovery must proceed in the same way as ordinary civil litigation.") Once again, in addition to

the authority to stay civil proceedings, a court is also authorized to "postpone civil discovery, or

impose protective orders or conditions 'when the interests of justice seem to require such

action.'" Dresser, 628 F.2d at 1375-76. For all the reasons stated in support of this motion, a

protective order staying discovery would also be appropriate relief.

III.    CONCLUSION

For the foregoing reasons, this Court should enter an order staying these proceedings or,

alternatively, a protective order staying discovery.

Respectfully submitted,

ROBERT J. SPAGNOLETTI
Attorney General

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

Nicole L. Lynch [471953]
Section Chief
General Litigation, Section II
Civil Litigation Division

6

Julie Lee [433292]
Senior Assistant Attorney General
General Litigation, Section II
Civil Litigation Division
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
(202) 724-6602; (202) 724-3625
Julie.Lee@dc.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TAKAISHA HENDERSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 06-00947 (HHK) |
| | ) |
| DISTRICT OF COLUMBIA, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## **ORDER**

Upon motion of the District of Columbia for a stay on the instant proceedings or,

alternatively, for a protective order staying discovery, and in consideration of the entire record

herein and for good cause shown, it is this ___ day of _____2006,

ORDERED, that defendant's motion is granted, and it is further

ORDERED, that this matter is stayed/no discovery shall take place except on order of

this court; and it is further

ORDERED that the District of Columbia must file a status report immediately after the

conclusion of the criminal investigation.

Judge Henry K. Kennedy
District Court Judge

8

# CIRCULAR

*Justice Enhancement Series*



**DISTRICT OF COLUMBIA**

| | |
|---|---|
| Title | MPD/DOJ |
| | Memorandum of Agreement |
| Series / Number | CIR – 02-06 |
| Effective Date | June 13, 2001 |
| Distribution | B |
| Expiration Date | June 13, 2006 |

# MEMORANDUM OF AGREEMENT



Between the United States Department of Justice
and the
District of Columbia
and the
District of Columbia Metropolitan Police Department

June 13, 2001



PLAINTIFF'S
EXHIBIT
2



**Metropolitan Police Department**
*Office of Professional Responsibility*
**MOA Compliance Monitoring Team**

# INTRODUCTORY NOTE

As most of you know, four years ago, I invited the Department of Justice into our Department to review serious allegations relating to our use of force and our investigations of such use of force. This followed a very troubling and largely accurate series of articles in *The Washington Post*. Since that time, we have made great strides in reforming the way we do business at the MPD. We still, however, have room to improve. The agreement achieved between the MPD, DOJ, and the City in June of last year identifies some of the areas that require continued improvement.

## MPD Compliance Coordinator and the Compliance Monitoring Team

Following initial efforts to meet MOA deadlines, I made several management changes in February 2002 related to the oversight of the Department's Memorandum of Agreement responsibilities. I promoted Joshua Ederheimer to Inspector and designated him as the MPD Compliance Coordinator (per MOA paragraph #173) and assigned supervision of the project to Assistant Chief Kim C. Dine of the Office of Professional Responsibility. Since that time, the Metropolitan Police Department has designated a Compliance Monitoring Team to assist in the implementation of the Memorandum of Agreement. A number of tasks, such as General Order revisions, have been completed to ensure Departmental compliance with MPD commitments enumerated in the Memorandum of Agreement.

## The Independent Monitor

On March 28, 2002, the Metropolitan Police Department and the law firm of Fried, Frank, Harris, Shriver & Jacobson jointly announced that Michael R. Bromwich had been selected as the Independent Monitor (per MOA paragraphs # 161-172). Mr. Bromwich is a partner at the firm, and is head of the internal investigations, compliance and monitoring practice group there.

As we continue our reform efforts in these critical areas, I am very pleased now to have access to the law enforcement experience and qualifications of Independent Monitor Michael Bromwich and the members of his monitoring team.

Our Department remains firmly committed to the reforms embodied in our agreement with the Justice Department and continues to implement changes in our use-of-force policies and practices. Just as we established a collaborative relationship with the Justice Department in reaching the agreement, we look forward to working closely and collaboratively with Mr. Bromwich and his team as we continue the hard work of implementation that lies ahead. Mr. Bromwich has a reputation for being tough but fair. That's exactly what we were looking for. I expect the entire MPD community to provide Mr. Bromwich and his team the assistance they need to accomplish this important mission.

Charles H. Ramsey
Chief of Police

CHR:NMJ:JE:MAR:afa

*Read summary of agreement*

## MEMORANDUM OF AGREEMENT

### Between the United States Department of Justice

### and the

### District of Columbia and

### the District of Columbia Metropolitan Police Department,

### June 13, 2001

### TABLE OF CONTENTS

**I. INTRODUCTION**

    A. Background

    B. General Provisions

    C. Definitions

**II. GENERAL USE OF FORCE POLICY REQUIREMENTS**

    A. General Use of Force Policy

    B. Use of Firearms Policy

    C. Canine Policies and Procedures

    D. Oleoresin Capsicum Spray Policy

    E. Implementation Schedule

**III. INCIDENT DOCUMENTATION, INVESTIGATION, AND REVIEW**

    A. Use of Force Reporting Policy and Use of Force Incident Report

    B. Investigating Uses of Force and Misconduct Allegations

        1. Use of Force Investigations

        2. Investigations of Misconduct Allegations

**IV. RECEIPT, INVESTIGATION, AND REVIEW OF MISCONDUCT ALLEGATIONS**

    A. Coordination and Cooperation Between MPD and OCCR

B. **Public Information and Outreach**

C. **Receipt of Complaints**

D. **OCCR Misconduct Investigations**

E. **Evaluating and Resolving MPD Misconduct Allegations**

V. **DISCIPLINE AND NON-DISCIPLINARY ACTION**

VI. **PERSONNEL PERFORMANCE MANAGEMENT SYSTEM**

A. **Performance Evaluation System**

VII. **TRAINING**

A. **Management Oversight**

B. **Curriculum**

C. **Instructors**

D. **Firearms Training**

E. **Canine Training**

VIII. **SPECIALIZED MISSION UNITS**

IX. **PUBLIC INFORMATION**

X. **MONITORING, REPORTING, AND IMPLEMENTATION**

A. **Independent Monitoring**

B. **MPD Compliance Coordinator**

C. **Reports and Records**

D. **Implementation, Termination, and Enforcement**

E. **Compliance**

F. **Modifications**

## MEMORANDUM OF AGREEMENT

### Between the United States Department of Justice

and the

District of Columbia and

the Washington Metropolitan Police Department,

## I. INTRODUCTION

### A. Background

1. In January 1999, District of Columbia Mayor Anthony A. Williams and Chief Charles H. Ramsey requested the Department of Justice to review all aspects of the Washington Metropolitan Police Department's use of force. This unprecedented request indicated the City and the Chief's commitment to minimizing the risk of excessive use of force in the Washington Metropolitan Police Department (MPD) and to promoting police integrity. Because of the unusual genesis of the investigation -- at the request of the agency to be investigated -- the Department of Justice agreed that, parallel with its pattern or practice investigation, it would provide MPD with technical assistance to correct identified deficiencies during the course of the investigation. The Department of Justice conducted the investigation requested by the City, and analyzed every reported use of force and citizen complaint alleging excessive use of force during the period from 1994 to through early 1999. The Department of Justice also examined MPD's policies, practices, and procedures related to use of force.

2. In addition to conducting an investigation, the Department of Justice has provided MPD with on-going technical assistance recommendations regarding its use of force policies and procedures, training, investigations, complaint handling, canine program, an early warning tracking system. Based upon these recommendations, MPD has begun to implement necessary reforms in the manner in which it investigates, monitors, and manages use of force issues.

3. The Department of Justice, the District of Columbia, and the District of Columbia Metropolitan Police Department, share a mutual interest in promoting effective and respectful policing. They join together in entering this agreement in order to minimize the risk of excessive use of force, to promote the use of the best available practices and procedures for police management, and to build upon recent improvements MPD has initiated to manage use of force issues. The parties acknowledge that additional reforms may be appropriate in order to identify and to prevent discriminatory law enforcement. The parties are currently reviewing officer communications on Mobile Data Terminals to identify unlawful or otherwise inappropriate conduct. Based upon the outcome of this review, MPD agrees to implement appropriate reforms.

### B. General Provisions

4. This agreement is effectuated pursuant to the authority granted DOJ under the Violent Crime Control and Law Enforcement Act of 1994 (42 U.S.C. §14141) to seek declaratory or equitable relief to remedy a pattern or practice of conduct by law enforcement officers that deprive individuals of rights, privileges or immunities secured by federal law.

` Nothing in this Agreement is intended to alter the lawful authority of MPD police officers to

use reasonable and necessary force, effect arrests and file charges, conduct searches or make seizures, or otherwise fulfill their law enforcement obligations to the people of the District of Columbia in a manner consistent with the requirements of the Constitution and laws of the United States and the District of Columbia.

6. Nothing in this Agreement is intended to: (a) alter the existing collective bargaining agreements between the City and MPD employee bargaining units; or (b) impair the collective bargaining rights of employees in those units under law.

7. This Agreement constitutes the entire integrated agreement of the parties. With the exception of thelatestworking drafts and correspondenceresulting from the technical assistance described in paragraph 2, no prior drafts or prior or contemporaneous communications, oral or written, shall be relevant or admissible for purposes of determining the meaning of any provisions herein in any litigation or any other proceeding.

8. This Agreement is binding upon the parties hereto, by and through their officials, agents, employees, and successors. This Agreement is enforceable only by the parties. No person or entity is intended to be a third party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement. This Agreement is not intended to impair or expand the right of any person or organization to seek relief against the District Columbia for its conduct or the conduct of MPD officers. This Agreement does not constitute an admission, adjudication, or finding on the merits in any action or proceeding. This Agreement does not authorize, nor shall it be construed to authorize, access to any City or MPD documents, except as expressly provided by this Agreement, by persons or entities other than DOJ, the City, and the Independent Monitor.

## C. Definitions

9. The term "actively resisting" means the subject is making physically evasive movements to defeat the officer's attempt at control, including bracing, tensing, pushing, or verbally signaling an intention not to be taken into or retained in custody, provided that the intent to resist has been clearly manifested.

10. The term "CCRB" means the Citizen Complaint Review Board.

11. The term "City" means the City of the District of Columbia.

12. The term "complaint" means any complaint by a member of the public regarding MPD services, policy or procedure, claims for damages (which allege officer misconduct) or officer misconduct; and any allegation of possible misconduct made by an MPD officer. All complaints shall be recorded on the complaint form described in paragraph 88. A complaint may be initiated by any of the methods set forth in paragraph 92. For purposes of this Agreement, the term "complaint" does not include any allegation of employment discrimination.

13. The term "complainant" means any person who files a complaint against an officer or MPD.

14. The term "consult" means an exchange of information in a timely manner between the parties intended to consider the parties' respective positions. This exchange of information shall

C 0 J 3 2 3

include, but not be limited to, preliminary investigative files, reports, statements, photographs, and radio runs, as such items become available.

15. The term "deadly force" means any use of force likely to cause death or serious physical injury, including but not limited to the use of a firearm or a strike to the head with a hard object.

16. The term "Department" means the Washington Metropolitan Police Department.

17. The terms "document" and "record" include all "writings and recordings" as defined by Federal Rules of Evidence Rule 1001(1).

18. The term "DOJ" means the United States Department of Justice and its agents and employees.

19. The term "effective date" means the day this Agreement is signed by all the parties.

20. The term "FIT" means the Force Investigation Team.

21. The term "including" means "including, but not limited to."

22. The term "Independent Monitor" or "Monitor" as used in this document means the Monitor established by Section X of this Agreement, and all persons or entities associated by the Monitor to assist in performing the monitoring tasks.

23. The term "MPD" means the Chief of Police of the Department and all employees under his or her command.

24. The term "MPD employee" means any employee under the command of the Chief of Police, including civilian employees.

25. The term "MPD unit" means any officially designated organization of officers within MPD, including Regional Operation Centers, Districts, Divisions, Groups, Patrol Service Areas, Teams, and specialized units.

26. The term "manager" means an MPD supervisor at the rank of lieutenant or above.

27. The term "non-deadly force" means any use of force that is neither likely nor intended to cause death or serious physical injury.

28. The term "non-disciplinary action" refers to action other than discipline taken by an MPD supervisor to enable or encourage an officer to modify his or her performance. It may include: oral or written counseling; training; increased field supervision for a specified time period; referral to Police/Fire Clinic; referral to the Employee Assistance Program; a change of an officer's partner; or a reassignment or transfer.

29. The term "OCCR" refers to the Office of Citizen Complaint Review.

    The term "OPR" refers to the Office of Professional Responsibility.

Memorandum of Agreement, United States Department of Justice and the District of Columbia. Page 26 of 33

Case 1:07-cv-01918-RJL-AK Document 16-2 Filed 12/05/2007 Page 26 of 33

31. The term "police officer" or "officer" means any law enforcement officer employed by MPD, including supervisors and managers.

32. The term "PPMS" means Personnel Performance Management System.

33. The term "serious use of force" means lethal and less-than-lethal actions by MPD officers including: (i) all firearm discharges by an MPD officer with the exception of range and training incidents and discharges at animals; (ii) all uses of force by an MPD officer resulting in a broken bone or an injury requiring hospitalization; (iii) all head strikes with an impact weapon: (iv) all uses of force by an MPD officer resulting in a loss of consciousness, or that create a substantial risk of death, serious disfigurement, disability or impairment of the functioning of any body part or organ; (v) all other uses of force by an MPD officer resulting in a death; and (vi) all incidents where a person receives a bite from an MPD canine.

34. The term "supervisor" means sergeant or above (or anyone acting in those capacities) and non-sworn personnel with oversight responsibility for other officers and managers.

35. The term "use of force" means any physical coercion used to effect, influence or persuade an individual to comply with an order from an officer. The term shall not include unresisted handcuffing. The term "use of force indicating potential criminal conduct by an officer" shall include all strikes, blows, kicks or other similar uses of force against a handcuffed subject.

## II. GENERAL USE OF FORCE POLICY REQUIREMENTS

### A. General Use of Force Policy

36. DOJ acknowledges that MPD has initiated a number of important use of force policy reforms. The provisions in this section build upon MPD's ongoing initiatives.

37. MPD shall complete development of a Use of Force Policy that complies with applicable law and current professional standards. The policy shall emphasize the goal of de-escalation and shall encourage officers to use advisements, warnings, and verbal persuasion when appropriate. The policy shall advise that the use of excessive force shall subject officers to discipline and possible criminal prosecution and/or civil liability.

38. The policy shall define and describe the types of force and the circumstances under which use of such force is appropriate. The policy shall prohibit officers from unholstering, drawing, or exhibiting a firearm unless the officer reasonably believes that a situation may escalate to the point where deadly force would be authorized.

39. The policy shall require officers, when feasible, to identify themselves as police officers and to issue a warning before discharging a firearm.

40. The policy shall require officers, immediately following a use of force, to inspect subjects for injury resulting from the use of force, and to obtain any necessary medical care.

### B. Use of Firearms Policy

000325

41. MPD shall complete development of a Use of Firearms policy that complies with applicable law and current professional standards. The policy shall prohibit officers from possessing or using unauthorized firearms or ammunition and shall inform officers that any such use may subject them to disciplinary action. The policy shall establish a single, uniform reporting system for all firearms discharges. The policy shall prohibit officers from obtaining service ammunition from any source except through official MPD channels, and shall specify the number of rounds MPD authorizes its officers to carry.

42. Within 30 days from the effective date of this agreement, the Mayor of the District of Columbia shall submit a request to the City Council for the District of Columbia for an amendment to Section 206.1 of Title 6A of the District of Columbia Municipal Regulations. The requested amendment shall permit the Chief of Police to determine the policy concerning the off-duty carrying of firearms by MPD officers while in the District of Columbia, including, but not limited to appropriate prohibitions regarding the carrying and or use of firearms in situations where an officer's performance may be impaired.

43. The policy shall require that when a weapon reportedly incurably malfunctions during an officer's attempt to fire, the weapon shall be taken out of service and an MPD armorer shall evaluate the functioning of the weapon as soon as possible. The policy shall require that, following the evaluation by the armorer, MPD shall document in writing whether the weapon had an inherent malfunction and was removed from service, malfunctioned because it was poorly maintained, or if the malfunction was officer-induced and a determination of the causes.

### C. Canine Policies and Procedures

44. DOJ acknowledges that MPD has implemented an interim canine policy via teletype and has initiated significant improvements in its canine operations, including the introduction of a new handler-controlled alert curriculum and the use of new canines.

45. The policy shall limit off-leash canine deployments, searches and other instances where there is otherwise a significant risk of a canine bite to a suspect, to instances in which the suspect is wanted for a serious felony or is wanted for a misdemeanor and is reasonably suspected to be armed. MPD shall continue to require canine officers to have approval from an immediate supervisor (sergeant or higher) before the canine can be deployed. If the handler is unable to contact a canine unit supervisor, approval must be sought from a field supervisor before the canine can be deployed. The approving supervisor shall not serve as a canine handler in the deployment. MPD shall continue to issue a loud and clear announcement that a canine will be deployed and advise the suspect to surrender and remain still if approached by a canine.

46. The policy shall also require that in all circumstances where a canine is permitted to bite or apprehend a suspect by biting, the handler shall call off the dog at the first possible moment the canine can be safely released. Whenever a canine-related injury occurs, immediate medical treatment must be sought either by rescue ambulance, transportation to an emergency room, or admission to a hospital.

### D. Oleoresin Capsicum Spray Policy

47. MPD shall complete development of an Oleoresin Capsicum Spray (OC Spray) policy that

complies with applicable law and current professional standards. The policy shall prohibit officers from using OC Spray unless the officer has legal cause to detain, take into legal custody or to maintain in custody a subject who is, at a minimum, actively resisting the officer. The policy shall prohibit officers from using OC spray to disperse crowds or others unless those crowds or others are committing acts of public disobedience endangering public safety and security.

48. The policy shall provide that, absent exceptional circumstances, officers shall not use OC spray on children and elderly persons. The policy shall prohibit officers from using OC spray to prevent property damage except when its use meets the standard defined in paragraph 47 above.

49. The policy shall require officers to issue a verbal warning to the subject unless a warning would endanger the officer or others. The warning shall advise the subject that OC spray shall be used unless resistance ends. The policy shall require that prior to discharging the OC spray, officers permit a reasonable period of time to allow compliance with the warning, when feasible.

50. The policy shall require officers to aim OC spray only at a person's face and upper torso. The policy shall require officers to utilize only two, one second bursts and to do so from at least 3 feet away from the subject, unless exceptional circumstances require otherwise. The policy shall require that, absent exceptional circumstances, officers shall decontaminate every sprayed subject with cool water or a decontamination solution within 20 minutes after the application of the spray. Officers shall transport sprayed subjects to the hospital for treatment when they complain of continued effects after having been contaminated, or they indicate that they have a pre-existing medical condition (e.g., asthma, emphysema, bronchitis, heart ailment, etc.) that may be aggravated by OC Spray. The policy shall prohibit officers from keeping any sprayed subject in a face down position, in order to avoid positional asphyxia.

### E. Implementation Schedule

51. MPD shall complete development of the policies and procedures referenced in this section within 30 days from the effective date of the agreement. In developing the final policies and procedures, MPD shall build upon the latest working drafts and correspondence exchanged between DOJ and MPD during the course of the investigation.

52. Prior to implementation of the policies and procedures referenced in this section, MPD shall submit them to DOJ for approval. In the event MPD revises any of the policies, procedures, or forms referenced in this section during the term of this agreement, it shall obtain approval from DOJ prior to implementation of the revised policy or form.

### III. INCIDENT DOCUMENTATION, INVESTIGATION, AND REVIEW

#### A. Use of Force Reporting Policy and Use of Force Incident Report

53. MPD shall complete development of a Use of Force Reporting policy and Use of Force Incident Report. The policy shall require officers to notify their supervisor immediately following any use of force or receipt of an allegation of excessive use of force and to complete a Use of Force Incident Report. Additionally, the policy shall require officers to complete a Use of Force Incident Report immediately following the drawing of and pointing of a firearm at, or in

000327

the direction of, another person. The policy shall require supervisors, upon notification of a use of force or allegation of excessive force, to respond to the scene. In every incident involving deadly force, as defined by paragraph 15, a serious use of force, as defined by paragraph 33, or any use of force indicating potential criminal conduct by an officer, as defined by paragraph 35, ~~the supervisor shall ensure that the Force Investigation Team (FIT) is immediately notified.~~

54. MPD shall notify the Office of the United States Attorney for the District of Columbia (USAO) immediately, in no case later than the next business day, following a deadly use of force or a serious use of force by an MPD officer or following any use of force indicating potential criminal conduct by an officer.

55. Data captured on the reports described above in paragraph 53 shall be entered into MPD's Personnel Performance Management System (PPMS). Hard copies of these reports shall be maintained centrally by the Office of Professional Responsibility.

   B. Investigating Uses of Force and Misconduct Allegations

      1. Use of Force Investigations

56. MPD created the Force Investigation Team (FIT) to conduct fair, impartial and professional reviews of firearm discharges. The provisions in this section build upon the investigative techniques employed by FIT and expand FIT's role within MPD.

57. Within 60 days from the effective date of this Agreement, MPD shall fully implement its plan, subject to approval of DOJ, to reallocate responsibility for MPD criminal investigations of officer use of force from District Violent Crime Unit supervisors or other District supervisors to the Force Investigation Team (FIT). The plan shall include procedures to address the rights and responsibilities of officers and supervisors in carrying out their duties, including the preparation of both preliminary investigative files and complete investigative files.

58. MPD shall consult with the USAO regarding the investigation of an incident involving deadly force, a serious use of force, or any other force indicating potential criminal misconduct by an officer. If the USAO indicates a desire to proceed criminally based on the on-going consultations with MPD, or MPD requests criminal prosecutions in these incidents, any compelled interview of the subject officers shall be delayed, as described in paragraph 60. However, in order to ensure the collection of all relevant information, all other aspects of the investigation shall proceed. The USAO shall respond to a written request by MPD for charges, declination, or prosecutorial opinion within three business days, by either filing charges, providing a letter of declination, or indicating the USAO's intention to continue further criminal investigation.

59. In every incident involving deadly force, a serious use of force, or any use of force indicating potential criminal misconduct by an officer, the USAO shall notify and consult with the Chief of Police or the appropriate OPR official whenever possible, unless doing so would compromise the investigation, or is otherwise prohibited by law, rule, or regulation.

60. MPD and the USAO jointly acknowledge the need to continue consultation throughout the course of an investigation; and recognize the investigative process may ultimately proceed to an administrative conclusion and/or criminal charges. MPD agrees that it will not compel or order

Memorandum of Agreement, United States Department of Justice and the District of Colu. Page 10 of 38

Case 1:01-cv-01514-GLF-AK    Document 5-3    Filed 12/06/2007    Page 12 of 13

a subject officer to make a statement if the USAO has not yet issued a written criminal declination, for all incidents subject to the notice and consultation provisions described in paragraphs 58 and 59.

~~61. FIT shall respond to the scene of every incident involving deadly force, a serious use of~~ force, or any use of force indicating potential criminal misconduct by an officer. In each of these incidents, FIT shall conduct the investigation of the use of force. That investigation may result in criminal charges, administrative action or both. Investigators from the involved officers' District shall not conduct the investigation. Based upon its review of use of force incidents from throughout MPD, FIT shall forward policy and training recommendations to the Chief of Police or his designee.

62. FIT shall complete its administrative use of force investigations within 90 days from the criminal declination described in paragraph 60, absent special circumstances which must be documented, and shall continue to conduct investigations in accordance with paragraphs 81 and 82, below. At the conclusion of each use of force investigation, the investigator shall prepare a report on the investigation, which shall be made a part of the investigation file. The report shall include a description of the use of force incident and any other uses of force identified during the course of the investigation; a summary and analysis of all relevant evidence gathered during the investigation; and proposed findings and analysis supporting the findings. The proposed findings shall include the following: 1) a determination of whether the use of force is consistent MPD policy and training; 2) a determination of whether proper tactics were employed; and 3) a determination whether lesser force alternatives were reasonably available.

63. Within 120 days from the effective date of this Agreement, MPD shall train and assign a sufficient number of personnel to FIT to fulfill the requirements of this Agreement.

64. Chain of command district supervisors may investigate all use of force incidents except for those incidents involving a serious use of force, serious physical injury, or any use of force indicating potential criminal conduct by an officer. At the discretion of the Chief of Police or designee, any incident that may be investigated by chain of command district supervisors may be assigned for investigation to FIT or to chain of command supervisors from a district other that the district in which the incident occurred. No supervisor who was involved in the incident shall be responsible for the investigation of the incident.

65. Chain of command use of force investigations shall be completed within 90 days following the use of force incident, absent special circumstances which must be documented, and shall be conducted in accordance with paragraphs 81 and 82, below. At the conclusion of each use of force investigation, the investigator shall prepare a report on the investigation, which shall be made a part of the investigation file. The report shall include a description of the use of force incident and any other uses of force identified during the course of the investigation; a summary and analysis of all relevant evidence gathered during the investigation; and proposed findings and analysis supporting the proposed findings. The proposed findings shall include the following: 1) a determination of whether the use of force is consistent and MPD policy and training; 2) a determination of whether proper tactics were employed; and 3) a determination whether lesser force alternatives were reasonably available.

66. Upon completion of a chain of command use of force investigation, the investigator shall forward the investigation to the Unit Commander, who shall review the investigation to ensure

that it is complete and that the findings are supported by the evidence. The Unit Commander shall order additional investigation when necessary. When the Unit Commander determines the investigation is complete and the findings are supported by the evidence, the investigation file shall be forwarded to the Use of Force Review Board (UFRB). Whenever there is evidence of ~~criminal wrongdoing, the Unit Commander shall suspend the investigation immediately and~~ notify FIT and the USAO.

67. Within 60 days from the effective date of this Agreement, MPD shall complete the development and implementation of a policy to enhance the UFRB, subject to approval by DOJ. The policy shall require the UFRB to conduct timely reviews of all use of force investigations. The policy shall set forth the membership of the UFRB and establish timelines for UFRB review of use of force investigations. The policy shall authorize the UFRB to recommend discipline for violations of MPD's policies and training. The policy shall authorize the UFRB to direct District supervisors to take non-disciplinary action to enable or encourage an officer to modify his or her performance . The policy shall require the UFRB to act as a quality control mechanism for all use of force investigations, with the responsibility to assign to FIT, or return to the investigating unit, all incomplete or mishandled use of force investigations. The policy shall provide the UFRB the authority and responsibility to recommend to the Chief of Police, or his designee, investigative protocols and standards for all force investigations. The policy shall require the UFRB to conduct annual reviews of all use of force cases examined to detect patterns/problems and to issue a report to the Chief of Police with findings and recommendations.

### 2. Investigations of Misconduct Allegations

68. The Office of Professional Responsibility shall be responsible for the investigation of allegations of criminal misconduct set forth in the categories in paragraph 72, (a) through (i) below. Within 60 days from the date of this Agreement, MPD shall develop a plan, subject to approval of DOJ, to allocate sufficient personnel and establish procedures to accomplish this new responsibility.

69. MPD shall notify the USAO immediately, in no case later than the next business day, following the receipt or discovery of any allegations of criminal misconduct referred to in paragraphs 72 and 73. In every incident involving allegations of criminal misconduct referred to in paragraphs 72 and 73, the USAO shall notify and consult with the Chief of Police or the appropriate OPR official whenever possible, unless doing so would compromise the investigation, or is otherwise prohibited by law, rule, or regulation.

70. MPD shall consult with the USAO regarding the investigation of an incident involving allegations of criminal misconduct in the categories of matters described in paragraphs 72 and 73. If the USAO indicates a desire to proceed criminally based on the on-going consultations with MPD, or MPD requests criminal prosecutions in these incidents, any compelled interview of the subject officers shall be delayed, as described in paragraph 71. However, in order to ensure the collection of all relevant information, all other aspects of the investigation shall proceed. The USAO shall respond to a written request by MPD for charges, declination, or prosecutorial opinion within three business days, by either filing charges, providing a letter of declination, or indicating the USAO's intention to continue further criminal investigation.

71. MPD and the USAO jointly acknowledge the need to continue consultation throughout the

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
Civil Division

TAKAISHA HENDERSON, *et al.*,     )
                                  )
            Plaintiffs,           )
                                  ) Civil Action No. 06-0947     (HHK)
      v.                          )
                                  )
DISTRICT OF COLUMBIA, *et al.*,   )
                                  )
            Defendants.           )
_____)

## DECLARATION OF RONALD B. HARRIS

I, Ronald B. Harris, under penalty of perjury under the laws of the United States of

America, declare the following:

1.    I am over the age of 18 and competent to render testimony.

2.    I am the Deputy General Counsel for the District of Columbia Metropolitan

      Police Department (MPD).

3.    The incident underlying this complaint involves a lethal shooting by an off-duty

      MPD officer of a civilian in the District of Columbia.

4.    At present, a grand jury is investigating the shooting to determine whether

      criminal charges should be filed.

5.    While this matter is under criminal investigation by the grand jury and the Office

      of the United States Attorney for the District of Columbia, MPD cannot release

      any information or documents associated with the incident without compromising

      the investigation.

_____
Ronald B. Harris
Deputy General Counsel

PLAINTIFF'S
EXHIBIT
3