UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
CHARLES RAWLINGS,                       )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )        Civil Action No. 07-1914 (PLF)
                                        )
DISTRICT OF COLUMBIA, *et al.*,         )
                                        )
            Defendants.                 )
_____ )

OPINION

        This matter is before the Court on a motion for summary judgment filed by

defendants Anthony Clay, James Haskel, and the District of Columbia.[1]  The plaintiff in this case

has brought constitutional and common law claims for an incident in which defendant Haskel, an

off-duty Metropolitan Police Department officer, accompanied by defendant Clay, another off-

duty police officer, shot and killed the plaintiff's fourteen-year old son.

        After hearing oral argument on the motion for summary judgment on October 11,

_____

        [1]      The papers reviewed in connection with this motion include: defendants'
memorandum in support of motion for summary judgment ("MSJ") [Dkt. No. 107]; plaintiff's
memorandum in opposition to summary judgment ("MSJ Opp.") [Dkt. No. 110]; defendants'
reply to opposition to summary judgment ("MSJ Reply") [Dkt. No. 114]; defendants' statement
of undisputed facts [Dkt. No. 107-1]; plaintiff's response to defendants' statement of undisputed
facts [Dkt. No. 110-1]; plaintiff's motion to strike exhibits to the defendants' motion for
summary judgment [Dkt. No. 109]; defendants' opposition to  plaintiff's motion to strike
exhibits [Dkt. No. 112];  plaintiff's reply to defendants' opposition to motion to strike [Dkt. No.
115].

        The plaintiff's motion to strike certain exhibits from the defendants' motion for
summary judgment has been denied without prejudice.  See Rawlings v. District of Columbia,
Civil Action No. 07-1914, Minute Order (Oct. 11, 2011).

2011, the Court denied the defendants' summary judgment motion with respect to the claim for

assault and battery against defendant Haskel (Count IV) and with respect to the claim for

deprivation of civil rights under 42 U.S.C. § 1983 against defendants Haskel and Clay (Count V).

See Rawlings v. District of Columbia, Civil Action No. 07-1914, Minute Order (Oct. 12, 2011).[2]

This Opinion addresses the defendants' summary judgment motion with respect to plaintiff's

claims for civil conspiracy against Clay and Haskel (Count VI), assault and battery against Clay

and the District of Columbia (Count IV), negligence against all three defendants (Count III), and

negligent training and supervision against the District of Columbia under common law and

Section 1983 (Counts III and VII).

For the reasons stated below, by Order of October 27, 2011, the Court denied the

defendants' motion with respect to the claim for conspiracy to commit assault and battery and it

granted the motion with respect to the claim for assault and battery against Clay, the claims for

negligence against all defendants, and the claims for negligent training and supervision under the

common law and Section 1983.

## I.  BACKGROUND

This lawsuit arises from an incident in which James Haskel, an off-duty District of

Columbia Metropolitan Police Department ("MPD") officer, shot and killed DeOnte Rawlings, a

fourteen-year old, near his home in Southeast Washington, D.C.

---

[2]    Both sides had proceeded on the assumption that plaintiff's Section 1983 claim
might be against both Haskel and Clay, even though Count V of the complaint did not mention
Clay.  The Court therefore granted plaintiff's oral motion to add Clay to Count V, see Rawlings
v. District of Columbia, Civil Action No. 07-1914, Minute Order (Oct. 11, 2011), which has now
been accomplished by plaintiff's amended complaint filed on October 24, 2011.

On September 17, 2007, at 6:00 p.m., Officer Haskel was driving home from an errand in his Chevrolet Tahoe.  He was not on duty that day.  MSJ Ex. 1 ("Haskel Dep."), at 27, 29-30.  On the way home, Haskel received a call from a neighbor notifying him that his red motorized minibike had been taken from his garage, the door to which had been left open.  Id. at 30-31.  When Haskel arrived home, he encountered neighbors outside who told him what had happened.  These neighbors had called the police to report the incident, and an officer had been dispatched.  Id. at 32, 43.  Haskel did not wait for the officer to arrive.  He testified in his deposition that he had an idea where the bike might be and decided to go looking for it.  Id. at 36-37, 39.  As he was leaving in his Tahoe, he saw Anthony Clay, a neighbor and fellow MPD officer who was also off duty.  Clay said he would accompany Haskel in search of the bike, and before they left Clay went inside his house to retrieve his gun, badge, and police radio.  Id. at 49, 50; MSJ Ex. 3 ("Clay Dep."), at 22, 25-27.  Haskel also had his gun and badge.  Haskel Dep. at 37.  The officers did not inform the Metropolitan Police Department that they were going to look for the minibike.  Id. at 39.

A few weeks earlier a bike had been stolen from Clay's home.  When a child was later seen riding the bike and told to drop it, the child complied and ran off.  Clay Dep. at 23-24, 91; Haskel Dep. at 37.  According to Clay, he anticipated that something similar might occur in regard to Haskel's minibike or that perhaps they would find the bike lying around somewhere.  Clay Dep. at 24.  Clay testified that he did not intend to make an arrest and that the two men did not discuss any plan.  Id. at 32, 91.  Haskel testified that he believed "some kids" had taken the minibike, and that if he confronted them and told them the bike was his, they would drop it and run off.  Haskel Dep. at 37.

Clay rode in the passenger seat of Haskel's Tahoe while Haskel drove and tried to spot his minibike. Clay Dep. at 31, 33. After driving around unsuccessfully for some time, the men turned into the alley of Washington Highland Dwellings. The alley, which is paved and has residential dwellings on either side, enters on 8th Street Southeast and exits on Atlantic Street. Haskel Dep. at 32, 51-54. Haskel was driving through the alley and approaching Atlantic Street when he saw a juvenile on a minibike and told Clay that it was his bike. Id. at 54-56; Clay Dep. at 35-36. The juvenile rode by the truck on the passenger side, going in the opposite direction. Haskel put the truck in reverse and backed up, now going in the same direction as the juvenile on the minibike and trying to catch up with him. Driving in this fashion, the truck and bike covered a distance of about two courtyards; at some point the juvenile crossed over to the other side of the alley, putting him on the driver's side of the truck. Haskel Dep. at 57-59; Clay Dep. at 36-39.

The plaintiff and defendants dispute what happened next. Clay and Haskel have testified that Haskel pulled alongside the juvenile, spoke to him through the driver's side window, and told him to drop the bike. As Haskel stopped the truck, the juvenile dropped the bike, got off, and said, "What, what?" Haskel Dep. at 58, 60; Clay Dep. at 39. The juvenile was about nine feet away from the truck. Haskel Dep. at 64-67. Haskel testified that he did not intend to make an arrest, but merely wanted to get his bike back. Id. at 61-62. According to Haskel, he then observed the juvenile draw a gun from his pocket. Although Haskel could not identify the make or model of the weapon, he recognized it as a gun. Upon seeing the juvenile pull out a weapon, Haskel drew his own gun. Id. at 62-63. According to Haskel, the juvenile then fired at Haskel. Id. at 64, 67. Haskel fired back, and then fired a second shot while still inside his vehicle. Id. at 74. The juvenile, after firing his first shot, began running away toward

4

an opening between two buildings, firing across his body while running sideways.  Id. at 73-74,

76-79.  Haskel exited his truck and fired three more times.  He then moved positions and fired

three more shots, for a total of eight.  Id. at 79-80.  After the last shot, the juvenile fell.  Id. at 80.

During the shooting, Haskel testified, he was not aware where Clay was or what he was doing.

Id. at 74, 76.

Clay testified that from the passenger seat, he saw the juvenile pull a metal object

from his pocket that Clay believed was a gun, and he notified Haskel of this.  Clay Dep. at 40-42.

 Believing that he could not be of assistance from where he was sitting, Clay exited the vehicle

through the passenger door to take cover.  Id. at 42, 51.  As he headed toward the rear of the truck

he heard multiple gunshots, but he could not see what was happening on the driver's side of the

truck.  Id. at 46.  By the time Clay reached the back of the truck and could see around it, the

juvenile was running away and firing a weapon across his body.  Id. at 43, 45-46, 88-89.  Clay

pulled his weapon out, but the juvenile was already out of sight, obscured by a dumpster or some

other object.  Id. at 46-48.  Clay never fired his weapon.  Id. at 51.

According to the officers, after the shooting Haskel told Clay to call for help on

the police radio.  Haskel Dep. at 82.  Clay testified that he knew shots had been fired but did not

know that the juvenile had been hit.  Clay Dep. at 54-56.  Clay attempted to call for assistance on

the radio, and was then assisted by Haskel, who told the dispatcher that a suspect was down.

Haskel Dep. at 83-84, 113; Clay Dep. at 50-54.  While this was happening, people were coming

out into the courtyard, and Haskel did not feel it was safe to approach the body.  Haskel Dep. at

82-83, 86, 90.  Haskel told Clay to drive his truck away from the scene, later testifying that he

was motivated by concern for the safety of his family and a desire not to have his vehicle seen

and associated with the shooting.  Id. at 93, 115.  Although the defendants have offered evidence

that Haskel's truck was hit with a bullet on the driver's side door, the officers testified that they

did not yet know the truck had been hit when Haskel asked Clay to drive it away.  Id. at 96; Clay

Dep. at 54, 56-57, 61.

      Clay complied with Haskel's request to remove the truck and drove it to Haskel's

house.  Clay Dep. at 64.  As Clay was leaving the scene of the shooting he encountered police

officers responding to the radio call; he waived them on and told them that the juvenile was in

the alley with a weapon.  Id. at 64.  Meanwhile, Haskel had asked that a unit meet him on a

nearby street; a cruiser met him there and drove him away from the scene.  Haskel Dep. at

99-100.  The cruiser sat nearby for a while, and then the officers in the cruiser drove Haskel to

his mother's house where he told her he was involved in a shooting.  Id. at 100-02.

Subsequently, a sergeant met Haskel there and took away his duty weapon.  Haskel then went to

the Seventh District police station, where he gave a statement to an investigating officer.  Id. at

104, 106-08.  Clay testified that when he brought the truck to Haskel's house, he learned that

Haskel had shot someone.  Clay Dep. at 74.  He called Haskel, who told him he was needed at

the station.  Id. at 68, 72-73.  Clay went to the station and also gave a statement to the

investigator.  Id. at 70-71, 77.

      During the course of the incident, neither Haskel nor Clay ever identified

themselves as police officers.  Haskel Dep. at 63-64; Clay Dep. at 69.  Clay testified that the

juvenile was wearing tan pants and a "uniform" shirt, Clay Dep. at 82, but Haskel provided no

identifying information about the juvenile.  He stated that he did not know DeOnte Rawlings and

only learned his identity later from the news.  Haskel Dep. at 109-10.

The defendants have provided documentary and physical evidence to corroborate their account.  See MSJ Ex. 5-9.  They have also offered a third eyewitness to the shooting — the only eyewitness besides the two officers.  "C.C." is a resident of the neighborhood who knew DeOnte Rawlings and was a few years older than him.  MSJ Ex. 4 ("C.C. Dep."), at 17, 19, 23.[3] C.C. testified that before the shooting, he was walking from his house through an opening in the buildings into the alley when he saw Rawlings riding a moped through the alley.  Id. at 19-20. C.C.'s account of the ensuing incident largely corroborates the officers' narrative: he testified that he saw the truck chasing Rawlings in reverse, as testified by the officers, and that when Rawlings and the truck stopped C.C. was only a few feet from Rawlings.  Like the officers, C.C. testified that Rawlings was the first person to pull out a gun, which C.C. recognized as a .38 caliber weapon, and that Rawlings fired first.  Id. at 23, 25-33, 39, 48, 62, 65, 68, 91-93.  After Rawlings fired his first shot, according to C.C., he and Rawlings began running away in the same general direction, and C.C. heard many gunshots.  Id. at 33-35, 65-68, 40.  C.C. eventually heard Rawlings fall.  Id. at 35.  When the gunshots ceased, C.C. looked back from his new location and observed the shooter standing near the truck for some time watching the spot where Rawlings had fallen, then making a phone call.  A police squad car then met the man and drove off.  C.C. also saw a second man drive the truck down the alley, and saw people chasing the truck down the alley while yelling at it.  Id. at 39-41, 105-07.  C.C. walked back toward Rawlings and saw him lying on the ground, as people crowded around the body.  Id. at 39, 42.[4]

---

[3]     The defense refers to this witness by his initials only, and has submitted his deposition under seal, in order to protect his identity.  See MSJ at 13 n.1.

[4]     As is evident, C.C.'s account of the incident is generally consistent with that of Clay and Haskel.  There is one major discrepancy, however, among the narratives.  C.C. testified

In October of 2007, the plaintiff filed this lawsuit against Clay, Haskel, and the District of Columbia, alleging constitutionally excessive use of force and negligent supervision under Section 1983 and the common law torts of assault and battery, conspiracy to commit assault and battery, negligence, and negligent supervision.  See Complaint ¶¶ 20-46.  The plaintiff does not question the officers' account of their actions before and after the shooting, although he disputes their explanations for their decisions.  The plaintiff denies that Rawlings possessed or fired a gun, and has presented evidence to that effect, including the fact that no gun was recovered from the scene and that Rawlings's clothing tested negative for lead residue.  See MSJ Opp. at 6.  The plaintiff also challenges the credibility of C.C.'s testimony and his motive for offering it.  See MSJ Opp. at 5-6.

Based on the evidence submitted, the Court has already determined that a genuine factual dispute exists about whether Rawlings possessed a gun and fired at the officers, facts that are material as to whether Haskel was legally justified in shooting him.  The Court therefore has denied summary judgment on the assault and battery claim against Haskel and the Section 1983

---

that after the truck stopped and Rawlings jumped off the bike, he observed a man exit the *passenger* side of the vehicle with his gun drawn, walk around the back of the truck, and ask Rawlings what he had in his hand ("What you got there?").  Rawlings responded, "Who is you?"  Each party repeated his question a few times, and then Rawlings fired.  After Rawlings fired his first shot, C.C. and Rawlings both ran away from the truck.  According to C.C., he never saw the driver of the vehicle draw a weapon.  C.C. Dep. at 26, 28, 31-33, 40, 48, 63-68.

According to the officers, Haskel spoke with Rawlings from the driver's seat, and Clay did not come around the truck or pull his weapon until Rawlings had already fired and was running away.  Clay could not even see the first shots being fired because he was still on the passenger side of the truck.  According to C.C., however, the passenger of the truck came around the vehicle with gun drawn, and it was this person, not the driver, who spoke with Rawlings.

claim against Clay and Haskel.  See Rawlings v. District of Columbia, Civil Action No. 07-1914,

Minute Order (Oct. 12, 2011).  This Opinion deals with the plaintiff's remaining claims.

## II.  LEGAL STANDARD

Summary judgment may be granted if "the pleadings, the discovery and disclosure

materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v.

Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  "A fact is 'material' if a dispute over it might affect

the outcome of a suit under the governing law; factual disputes that are 'irrelevant or

unnecessary' do not affect the summary judgment determination."  Holcomb v. Powell, 433 F.3d

at 895 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  An issue is "genuine" if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott

v. Harris, 550 U.S. 372, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; Holcomb

v. Powell, 433 F.3d at 895.

When a motion for summary judgment is under consideration, "the evidence of

the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."

Anderson v. Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. Potomac Elec. Power Co.,

447 F.3d 843, 849-50 (D.C. Cir. 2006); Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1288

(D.C. Cir. 1998) (en banc); Washington Post Co. v. U.S. Dep't of Health & Human Servs., 865

F.2d 320, 325 (D.C. Cir. 1989). The non-moving party's opposition, however, must consist of

more than mere unsupported allegations or denials and must be supported by affidavits,

declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-moving party is required to provide evidence that would permit a reasonable jury to find in its favor. Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50; see Scott v. Harris, 550 U.S. at 380 ("[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'") (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). To defeat a motion for summary judgment, a plaintiff must have more than "a scintilla of evidence to support his claims." Freedman v. MCI Telecomms. Corp., 255 F.3d 840, 845 (D.C. Cir. 2001). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

## III.  DISCUSSION

### A.  Conspiracy to Commit Assault and Battery (Count VI)

In the District of Columbia, civil conspiracy "is not an independent tort but only a means for establishing vicarious liability for an underlying tort." Nader v. Democratic Nat'l Committee, 567 F.3d 692, 697 (D.C. Cir. 2009) (quoting Hill v. Medlantic Health Care Group, 933 A.2d 314, 334 (D.C. 2007)). It serves as a device "through which vicarious liability for the underlying wrong may be imposed upon all who are a party to it, where the requisite agreement exists among them." Riddell v. Riddell Washington Corp., 866 F.2d 1480, 1493 (D.C. Cir.

10

1989) (citing Halberstam v. Welch, 705 F.2d 472, 479 (D.C. Cir. 1983)).  The elements of civil

conspiracy are: "(1) an agreement between two or more persons; (2) to participate in an unlawful

act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act

performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the

common scheme."  Executive Sandwich Shoppe, Inc. v. Carr Realty Corp., 749 A.2d 724, 738

(D.C. 2000); accord Second Amendment Foundation v. U.S. Conference of Mayors, 274 F.3d

521, 524 (D.C. Cir. 2001).  "Proof of a tacit, as opposed to explicit, understanding is sufficient to

show agreement."  Halberstam v. Welch, 705 F.2d at 477.

### 1.  The Intracorporate Conspiracy Doctrine

The plaintiff has brought claims of civil conspiracy against Clay and Haskel,

alleging that they "entered into an agreement to commit the illegal act of assault and battery"

against Rawlings.  Complaint ¶ 37.  The defendants argue that Clay and Haskel cannot be found

liable for conspiracy because they "are part of a single entity, the District of Columbia

Government."  MSJ at 39 (citing Gladden v. Barry, 558 F. Supp. 676, 679 (D.D.C. 1983)).  The

defendants thus invoke the "intracorporate conspiracy" doctrine, under which "there is no

conspiracy if the conspiratorial conduct challenged is essentially a single act by a single

corporation acting exclusively through its own directors, officers, and employees."  Herrmann v.

Moore, 576 F.2d 453, 459 (2d Cir. 1978).

Many circuits have applied the intracorporate conspiracy doctrine in civil rights

cases under 42 U.S.C. § 1985 to preclude conspiracy liability for the employees of a municipal

entity, while other circuits have declined to apply the doctrine in that context.  See Bowie v.

Maddox, 642 F.3d 1122, 1130-31 (D.C. Cir. 2011).  Although the D.C. Circuit has not ruled on

the issue, id. at 1130 n.4, 1131, district courts within this circuit "consistently have applied the

intracorporate conspiracy doctrine to Section 1985."  Tabb v. District of Columbia, 477 F. Supp.

2d 185, 190 (D.D.C. 2007) (listing cases).  The defendants cite these decisions in support of their

argument that because Clay and Haskel are both MPD officers, they are immune from civil

conspiracy claims.

    While most federal circuits apply the doctrine in Section 1985 cases, only one

seemingly has applied it to Section 1983 claims, and never with respect to claims — such as the

use of excessive force — analogous to common law assault and battery.  See, e.g., Grider v. City

of Auburn, 618 F.3d 1240, 1259-63 (11th Cir. 2010) (malicious prosecution); Rehberg v. Paulk,

611 F.3d 828, 854 (11th Cir. 2010) (retaliatory prosecution).  Thus, the defendants' recitation of

cases involving Section 1985 does not necessarily demonstrate that the doctrine should preclude

all claims for conspiracy under any cause of action.  The defendants cite no cases in which the

intracorporate conspiracy doctrine was applied to a claim for conspiracy to commit assault and

battery, and it is far from clear that the doctrine should apply to such a claim.  The District of

Columbia Court of Appeals does not appear to have addressed whether or to what extent it

recognizes the doctrine in regard to alleged violations of D.C. statutory or common law.  See

Executive Sandwich Shoppe, Inc. v. Carr Realty Corp., 749 A.2d at 739.

    Even were this Court to assume that the intracorporate conspiracy doctrine may in

some circumstances apply to assault and battery claims, it would not apply in this case.  Where

courts have recognized the doctrine, they have included an important caveat that is implicated

here: for the doctrine to apply, the individual defendants must have been acting within the scope

of their shared employment.  See, e.g., Herrmann v. Moore, 576 F.2d at 459 (no conspiracy arises

from what is "essentially a single act by a single corporation acting exclusively through its own

directors, officers, and employees, *each acting within the scope of his employment*") (emphasis

added); Brown v. Sim, No. 03-2655, 2005 WL 3276190, at *3 (D.D.C. Sept. 30, 2005 )

("[E]mployees, *when acting in the scope of their employment*, cannot conspire among

themselves.") (quotation omitted) (emphasis added); James Taylor Trash Removal v. Dist. of

Columbia, No. 99-1551, 1999 U.S. Dist. LEXIS 13845, at *8 (D.D.C. Sept. 1, 1999) ("D.C.

government officials, *acting within the scope of their employment*, are considered members of a

single entity for the purposes of § 1985.") (emphasis added).

        Limiting the scope of the intracorporate conspiracy doctrine in this manner is a

sensible corollary to the main thrust of the rule.  The doctrine is premised on the idea that the

behavior of a corporation's agents is attributable to the corporation itself, "so that all of their acts

are considered to be those of a single legal actor, negating the multiplicity of actors necessary to

conspiracy."  Dussouy v. Gulf Coast Investment Corp., 660 F.2d 594, 603 (5th Cir. 1981); see

also Tabb v. District of Columbia, 477 F. Supp. 2d at 190 (the doctrine "is based on the notion

that a corporation and its agents constitute a single legal entity that cannot conspire with itself,

just as it is impossible for an individual person to conspire with himself") (citing Dickerson v.

Alachua County Comm., 200 F.3d 761, 767 (11th Cir. 2000)).  But when two individuals agree

on a course of conduct that is not part of their employment responsibilities, their behavior does

not constitute "the actions of a single entity . . . through its officials," Gladden v. Barry, 558 F.

Supp. at 679, and no rationale exists for shielding them from conspiracy liability merely because

they happen to share the same employer.  In Kivanc v. Ramsey, 407 F. Supp. 2d 270 (D.D.C.

2006), this Court explained: "The intracorporate conspiracy doctrine was created 'to shield corporations and their employees from conspiracy liability for routine, collaborative business decisions that are later alleged to be discriminatory.'" Id. at 275-76 (quoting Newsome v. James, No. 96 C 7680, 2000 WL 528475, at *14-15 (N.D. Ill. Apr. 26, 2000)). The Court was "not persuaded that agreements to conceal assault and battery with false police reports . . . could conceivably be classified as the products of routine police department decision-making" or be considered a part of the defendants' employment responsibilities. Id. at 276.

By contrast, in Tafler v. District of Columbia, No. 05-1563, 2006 WL 3254491 (D.D.C. Nov. 8, 2006), the plaintiff sued two police officers for conspiring to deprive him of his constitutional freedom from excessive force after they arrested him for attempted burglary. In dismissing the plaintiff's conspiracy claim, the Court noted that the plaintiff "has failed to allege that the defendant police officers in this case were acting outside the scope of their employment and has further failed to offer any argument as to why the intracorporate conspiracy doctrine should not apply." Id. at *10; see also Tabb v. District of Columbia, 477 F. Supp. 2d at 191 (rejecting conspiracy claim because the plaintiff did not allege that defendants were acting outside the scope of their employment).

In this case, Clay and Haskel themselves have asserted that they were acting as private citizens, rather than as police officers, when they went in search of the missing minibike. Unlike the defendants in Tafler, Clay and Haskel were not patrolling officers carrying out an arrest. Instead, they admittedly were pursuing personal rather than official ends while off-duty. The officers have testified that they did not intend to make an arrest or take any police action. They did not notify the MPD that they were going in search of the bike, nor did they wait for the

14

responding officer who had been called to investigate the bike theft.  The officers drove in

Haskel's personal, unmarked vehicle, and never identified themselves as police officers during

the sequence of events that followed.  Furthermore, even if it could be argued that the officers

generally were acting within the scope of their duties when they went about searching for the

minibike, any conspiracy that Clay and Haskel may have entered into in order to harm the

possessor of the stolen minibike or to retrieve it through illegal means was clearly not part of

their duties.  Such an illicit agreement would not represent a decision made by the MPD and

carried out by its two officers.  Like the alleged falsification of police reports in <u>Kivanc</u>, such an

agreement could not conceivably be classified as the product of routine police department

decision-making.  Therefore the intracorporate conspiracy doctrine does not shield Clay and

Haskel from liability if they conspired to commit an assault and battery upon Rawlings.[5]

   The Court also finds that the intracorporate conspiracy doctrine should not apply

for a second, related reason.  Some courts that employ the doctrine "have recognized an

exception where an officer or agent has 'an independent personal stake in achieving the

corporation's illegal objectives.'"  <u>Brever v. Rockwell Int'l Corp.</u>, 40 F.3d 1119, 1127 (10th Cir.

1994) (quoting <u>Buschi v. Kirven</u>, 775 F.2d 1240, 1252 (4th Cir. 1985)); <u>see</u> <u>also</u> <u>Dussouy v. Gulf</u>

<u>Coast Investment Corp.</u>, 660 F.2d at 603 (explaining that courts have held that "when the officers

of a corporation act for their own personal purposes, they become independent actors, who can

---

[5]   If it were true that Haskel returned fire only in response to the unprovoked
brandishing or firing of a weapon by the juvenile on the minibike, then the defendants' conduct
at that point could perhaps be viewed as police action taken to halt a crime and ensure public
safety.  If the jury credits this version of the facts, however, then the plaintiff's conspiracy claim
has necessarily already failed, because the shooting was not the result of a prior agreement to
commit an assault and battery.

conspire with the corporation"). This exception, like the requirement that employees be acting within the scope of their duties, limits the scope of the doctrine to those circumstances where an employee's act is fairly attributable to the employer, and where the harm of a conspiratorial agreement is not present.

Clay and Haskel admittedly had a personal stake in recovering Haskel's missing minibike and testified in their depositions that they acted only to achieve this goal and without any intent to carry out an arrest. If the two men entered into a conspiracy to behave illegally in pursuit of that goal, the conspiracy was motivated at least in part by their personal interest in retrieval of the bike. Thus, even if it were true that Clay and Haskel acted within the scope of their duties as MPD officers while seeking to recover the minibike, their own personal interest in the accomplishment of that goal — an interest distinct from any interest of the MPD — prevents them from obtaining immunity on the plaintiff's claim for conspiracy to commit assault and battery.

### 2. Genuine Issues of Material Fact

The plaintiff presents no direct evidence of a conspiracy between Clay and Haskel. Such a shortcoming is neither rare nor fatal in conspiracy cases. By their nature, "conspiracies must generally be inferred from indirect evidence." Ungar v. Islamic Republic of Iran, 211 F. Supp. 2d 91, 100 (D.D.C. 2002); accord Halberstam v. Welch, 705 F.2d at 486 ("[C]ourts have to infer an agreement from indirect evidence in most civil conspiracy cases."); see also Adickes v. S.H. Kress and Co., 398 U.S. 144, 157 (1970) (agreeing that although plaintiff had no knowledge of an agreement between the alleged conspirators, "the sequence of

16

events created a substantial enough possibility of a conspiracy to allow her to proceed to trial,

especially given the fact that the noncircumstantial evidence of the conspiracy could only come

from adverse witnesses").  "The circumstances of the wrongdoing generally dictate what

evidence is relevant or available in deciding whether an agreement exists."  Halberstam v.

Welch, 705 F.2d at 486.  Factors to be considered include "the relationship between the parties'

acts, the time and place of their execution, and the duration of the joint activity."  Id.

   The plaintiff contends that an agreement between Clay and Haskel to commit an

assault and battery can be inferred from their conduct before and after the shooting.  Specifically,

the plaintiff highlights a number of undisputed facts:  The officers went to search for the

minibike without waiting for the responding officer who had been called to investigate the theft.

They did not advise anyone from the police department of their activities.  Both men were armed,

and Clay specifically returned to his home to retrieve his gun.  Upon confronting a juvenile riding

Haskel's minibike, they did not at any time identify themselves as police officers, nor did they at

that point contact the Metropolitan Police Department, although Clay had his police radio with

him.  After the shooting, the officers did not secure the scene or preserve any evidence, nor did

they attempt to offer medical assistance to the juvenile who had been shot.  At Haskel's

direction, Clay removed the truck, and both men left the scene.

   While these facts may not overwhelmingly imply the existence of a conspiracy to

commit assault and battery, they are probative, and the jury should be given the opportunity to

assess the evidence presented at a trial and then decide whether an unlawful agreement can be

inferred from the officers' behavior.[6]  In their depositions, Clay and Haskel offer explanations for

many of their decisions.  To evaluate the legitimacy of those explanations, the jury can assess the

demeanor and credibility of the two men on the witness stand, as well as the credibility of other

witnesses and the probative value of all the evidence.  At the summary judgment stage, the Court

"cannot make credibility determinations," Johnson v. District of Columbia, 528 F.3d 969, 973

(D.C. Cir. 2008) (citing Anderson v. Liberty Lobby, 477 U.S. at 249), and "all inferences must be

viewed in a light most favorable to the non-moving party." Chambers v. U.S. Dep't of Interior,

568 F.3d 998, 1003 (D.C. Cir. 2009) (quotation omitted); see also Rogers Corp. v. E.P.A., 275

F.3d 1096, 1103 (D.C. Cir. 2002) ("Summary judgment is inappropriate when contradictory

inferences may be drawn from the evidence.").  Applying these standards, the Court is not

prepared to find that the plaintiff's circumstantial evidence is so insubstantial that no reasonable

jury could infer the existence of a conspiracy.

### B.  Assault and Battery (Count IV)

An assault is "'an intentional and unlawful attempt or threat, either by words or by

acts, to do physical harm to the victim.'" Evans-Reid v. District of Columbia, 930 A.2d 930, 937

(D.C. 2007) (quoting Etheredge v. District of Columbia, 635 A.2d 908, 916 (D.C. 1993)).  A

battery is "'an intentional act that causes a harmful or offensive bodily contact.'" Id.  A police

officer has a qualified privilege to use reasonable force to effect an arrest, provided that the

---

[6]     The jury will be called upon to make this determination only if it first concludes
that Haskel or Clay are liable for assault and battery.  A claim for civil conspiracy is not viable
unless the elements of the underlying tort are satisfied. Nader v. Democratic Nat'l Committee,
567 F.3d at 697 (citing Executive Sandwich Shoppe, Inc. v. Carr Realty Corp., 749 A.2d at 738).
But see infra at 19-20.

means employed are not "'in excess of those which the actor reasonably believes to be necessary.'" Etheredge v. District of Columbia, 635 A.2d at 916 (quoting Jackson v. District of Columbia, 412 A.2d 948, 956 (D.C. 1979)). "[I]n most cases involving intentional shootings by police officers, there [is] ample evidence to satisfy the elements of the tort of assault and battery, and the issue of liability turns on the defense of privilege." Evans-Reid v. District of Columbia, 930 A.2d at 937.

The Court already has denied summary judgment to Officer Haskel on the assault and battery claim, finding that there are genuinely disputed questions of material fact that must be decided by the jury. See Rawlings v. District of Columbia, Civil Action No. 07-1914, Minute Order (Oct. 12, 2011).

### 1.  Officer Clay

Defendant Clay argues that he cannot be held liable for assault and battery because there is no evidence that he fired his gun or engaged in any other assaultive conduct during the incident. MSJ at 35. According to the defendants, Clay's mere presence on the scene does not form a basis for liability because he "used no force." MSJ Reply at 11. The defendants are correct that Clay's presence at the shooting, without more, cannot render him liable for assault and battery. Chen v. District of Columbia, --- F. Supp. 2d ----, 2011 WL 3966155, at *4 (D.D.C. Sept. 9, 2011) (granting summary judgment for defendant on assault and battery claim because "there is no evidence in the record before the Court that [the defendant] ever touched [the plaintiff] or caused her to be touched" nor that the defendant "ever attempted or threatened to harm [the plaintiff] physically"); see also Halberstam v. Welch, 705 F.2d at 481.

19

Some limited authority suggests that if Clay encouraged, incited, or assisted the shooting, then he may be liable for aiding and abetting an assault and battery. See Halberstam v. Welch, 705 F.2d at 481-82 ("suggestive words" or "verbal encouragement" may lead to liability for a battery even when the defendant has not "physically assisted in the battery"). The plaintiff's complaint does not include a claim of aiding and abetting assault and battery, however, nor have the plaintiff's filings anywhere addressed aiding and abetting liability. Moreover, the plaintiff has not presented any evidence indicating that Clay may have encouraged, incited, or assisted in the shooting. Even if Clay could be liable under this theory, therefore, the Court would grant summary judgment on the claim because there is no evidence to support it.

The plaintiff's allegation that Clay entered into an agreement with Haskel to commit an assault and battery is cognizable as a claim for civil conspiracy. See supra at 10-18; Halberstam v. Welch, 705 F.2d at 479-86 (explaining the distinction between conspiracy and aiding and abetting). Furthermore, Clay could potentially be liable in negligence for failing to prevent an assault committed by a fellow officer. See infra at 28-31. But because the plaintiff has not offered any evidence that Clay participated in the alleged assault and battery against Rawlings, nor that he encouraged, incited, or assisted Haskel in carrying out the assault, the plaintiff's claim for assault and battery against Clay cannot survive summary judgment.

### 2. District of Columbia

The defendants acknowledge that if Haskel is found liable for assault and battery, then the District of Columbia could be vicariously liable based on respondeat superior. MSJ Reply at 13. This is correct, so long as the officers "were acting as agents of the District within

the scope of their employment."  Youngbey v. District of Columbia, 766 F. Supp. 2d 197, 218

(D.D.C. 2011) (citing Bostic v. District of Columbia, 906 A.2d 327, 331 (D.C. App. 2006));

accord Evans-Reid v. District of Columbia, 930 A.2d at 937 ("The District is vicariously liable

for the intentional and negligent acts of its officers acting within the scope of their

employment.").  While it is far from clear that plaintiff can show that Haskel was acting within

the scope of his employment — and his conspiracy claim is at risk if he does — the question

whether an employee is acting within the scope of employment is generally a question of fact for

the jury.  Therefore if the jury finds Haskel liable for assault and battery against Rawlings, the

District may be vicariously liable if the jury also concludes that Haskel was acting within the

scope of his employment during the incident.

### C.  Negligence (Count III)

In addition to claims for the intentional torts of assault and battery, the plaintiff

has also brought negligence claims against the officers and the District of Columbia, alleging that

the defendants "negligently took police action while in an off duty capacity, in an unmarked

vehicle, without identifying themselves at all during the course of their negligent stop and chase

of the decedent and in subsequently using unlawful, excessive and unreasonable force on

decedent, DeOnte Rawlings, inasmuch as no force whatsoever was warranted under the

circumstances."  Complaint ¶ 27.

The District of Columbia Court of Appeals has recognized that "it is impossible to

negligently commit assault and/or battery as the states of mind are separate and incompatible."

District of Columbia v. Chinn, 839 A.2d 701, 708 (D.C. 2003) (citing Sabir v. District of

Columbia, 755 A.2d 449, 452 (D.C. 2000)).  But the court also has held that "in certain circumstances the events surrounding the application of excessive force may lend themselves to a theory of negligence as well." Id. at 707.  In such cases, a plaintiff may bring both negligence and assault and battery claims.  "[I]n a case involving the intentional use of force by police officers," in order for a plaintiff to submit both claims to the jury, "th[e] negligence must be distinctly pled and based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself and violative of a distinct standard of care." Id. at 711.  The duty not to use excessive force cannot serve as the standard of care for the negligence count. Id.  Instead, the plaintiff must identify "at least one distinct element, involving an independent breach of a standard of care beyond that of not using excessive force in making an arrest, which may properly be analyzed and considered by the jury on its own terms apart from the intentional tort of battery and the defense of privilege." Id. at 707; see also Dormu v. District of Columbia, --- F. Supp. 2d ----, 2011 WL 2632330, at *13-*14 (D.D.C. June 7, 2011) (applying the Chinn standard); Austin v. District of Columbia, No. 05-2219, 2007 WL 1404444, at *3-*6 (D.D.C. May 11, 2007) (same).

In this case, the plaintiff has satisfied the first requirement of Chinn by separately pleading negligence.  The next question is whether the plaintiff's claim is based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force.  The plaintiff has posited several distinct theories of negligence liability, as he is entitled to do, based on at least two alternative factual scenarios.  "When an individual is shot by a District of Columbia police officer, and he or his successors in interest decide to bring a lawsuit, they may proceed under one or more different common law theories of legal liability," including "one or

more theories of negligence." Evans-Reid v. District of Columbia, 930 A.2d at 937. The Court will address the plaintiff's alternate theories in turn.

### 1. Negligence Based on Unreasonable Use of Force (Clay and Haskel)

The plaintiff alleges that the officers were negligent in "using unlawful, excessive and unreasonable force on decedent, DeOnte Rawlings, inasmuch as no force whatsoever was warranted under the circumstances." Complaint ¶ 27. This conduct allegedly violated the officers' duty "to employ only reasonable measures in their interaction with and treatment of the decedent." Id. ¶ 26. Plainly, this claim presents no standard of care distinct from the duty not to use unreasonable force, and the claim therefore is indistinguishable from the assault and battery claim. See District of Columbia v. Chinn, 839 A.2d at 707-12. For the reasons discussed above, it cannot proceed to the jury. See Austin v. District of Columbia, 2007 WL 1404444, at *6 (finding that police department policies on reasonable use of force may constitute evidence of a specific standard of care, but that this standard would not be "distinct from the excessive force standard") (quotation omitted).

### 2. Negligence Based on Provoking Gunfire (Clay and Haskel)

The plaintiff also alleges that the defendants "negligently took police action while in an off duty capacity, in an unmarked vehicle, without identifying themselves at all during the course of their negligence stop and chase of the decedent," Complaint ¶ 27, and asserts that "a proximate cause" of Rawlings's death "was the officers [sic] failure to identify themselves; chasing a teenager with a truck and forcing him off the bike, confronting him after he falls, still without identifying themselves and pointing a gun out of the truck at the juvenile." MSJ Opp. at

23

23.  "Taking such action in a high crime neighborhood," according to the plaintiff, "was nothing if not negligent."  <u>Id</u>.

The plaintiff appears to suggest, therefore, that even if the juvenile on the minibike fired a gun at the officers in response to their questioning, the officers' prior decision to accost the juvenile in the manner that they did was an act of negligence that proximately caused Rawlings's death.  As plaintiff's counsel stated during oral argument, the officers' wayward tactics "created the situation" that led to the shooting, and for that they may be held liable.  This theory is untenable.  Even if it were true that confronting a juvenile in the manner attributed to Clay and Haskel violated an applicable standard of care, the juvenile's attack with a deadly weapon in response would constitute an intervening force breaking the chain of causation.

In <u>Hundley v. District of Columbia</u>, 494 F.3d 1097 (D.C. Cir. 2007), the plaintiff similarly argued that the defendant police officer was liable for a shooting death even if the officer shot the decedent in self-defense, because the officer was negligent for stopping the decedent in the first place, "and was therefore responsible for the harm that followed."  <u>Id</u>. at 1104.  The D.C. Circuit disagreed, finding that in such a scenario, "it cannot be said that [the officer's] negligence in approaching [the decedent] proximately caused the shooting death."  <u>Id</u>. (citing <u>District of Columbia v. Price</u>, 759 A.2d 181 (D.C. 2000)).  As the court explained, the District of Columbia follows the basic tort principle that "an intervening force breaks the chain of proximate causation when that intervening force is sufficiently unforeseeable as to constitute a superseding cause."  <u>Id</u>. (citing <u>Butts v. United States</u>, 822 A.2d 407, 418 (D.C. 2003)).  The court continued: "As a matter of law, it is not ordinarily reasonable to foresee that a citizen will

react to a police stop by attacking the detaining officer, thereby triggering a situation that requires the officer to use deadly force in self-defense." Id. at 1105.

Although the circumstances are different in this case — where a juvenile was confronted by two men in a vehicle who did not identify themselves as police officers — as in Hundley it was not reasonably foreseeable, even in "a high crime neighborhood," that a juvenile would respond to Clay and Haskel's inquiries by drawing a gun and shooting at them.  Therefore even if Clay or Haskel breached a duty of care by accosting the juvenile on the minibike, if the juvenile responded by shooting at them, the officers are not liable for the consequences that followed based on any prior negligence in initiating the encounter.  The same principle applies whether it was Rawlings who fired a gun at the officers or whether (as the plaintiff has posited as an alternative scenario) it was a different juvenile whom the officers confronted on the bike and who fired at them.  See Hundley v. District of Columbia, 494 F.3d at 1104-05.  Whatever the wisdom or propriety of stopping this juvenile and telling him to drop the minibike without identifying themselves as police officers, doing so did not present an "unreasonable" risk of instigating gunfire.  See id. at 1104.

If, on the other hand, no gun was fired at the officers by any juvenile, then the plaintiff has not identified any standard of care (other than the duty not to use excessive force) the violation of which could have caused Rawlings's death.  See District of Columbia v. Chinn, 839 A.2d at 707.  The plaintiff thus cannot proceed on a negligence claim against Clay or Haskel based on the manner in which they accosted the juvenile or their failure to identify themselves as police officers.

3.   Negligence Based on Shooting the Wrong Individual (Haskel)

The plaintiff has presented evidence that Rawlings was not in possession of and did not fire a gun.  Based on this evidence, the plaintiff's filings suggest two possible scenarios under which Haskel could be held liable for the shooting: (1) no one fired a gun at the officers; or (2) it was not Rawlings but a different juvenile whom the officers confronted and who shot at them, and in returning fire Haskel inadvertently shot Rawlings.[7]  The latter scenario represents the basis for one of the plaintiff's theories of negligence liability.

If the juvenile in this situation initiated the violence by firing a gun at Clay and Haskel, the officers had a right to fire back.  Evans-Reid v. District of Columbia, 930 A.2d at 937 (a police officer may use deadly force "'if the user actually and reasonably believes, at the time such force is used, that he or she (or a third person) is in imminent peril of death or serious bodily harm'") (quoting Etheredge v. District of Columbia, 635 A.2d 908, 916 (D.C. 1993)). Furthermore, the Court has determined that the officers cannot be held liable in negligence for "creating the situation" in which a juvenile opened fire on them.  Therefore, the plaintiff can prevail on this theory only by demonstrating that someone besides Rawlings fired on the officers and that although the officers were justified in returning fire on their attacker, it was negligent for them to have inadvertently shot Rawlings instead.

---

[7]      In support of the latter scenario, the plaintiff points to the fact that neither Clay nor Haskel could specifically identify Rawlings as the juvenile they confronted on the minibike, and that Haskel has admitted that when he fired upon the juvenile there were other people in the vicinity and he was firing toward an area where there were residential buildings.  See MSJ at 12; Haskel Dep. at 78-79.  Defense counsel, at oral argument, indicated an understanding that these two scenarios represent the plaintiff's alternative theories of what occurred during the shooting, an understanding that plaintiff's counsel subsequently confirmed.

It is clear that only Haskel is potentially subject to liability on this theory.  The undisputed evidence is that Haskel fired the shot that killed Rawlings, and the plaintiff has not presented any evidence that Clay fired his gun at all.  The plaintiff has offered no basis on which Clay could be liable in negligence for Haskel's inadvertent shooting of the wrong individual while acting in self-defense.

With respect to plaintiff's claim against Haskel on this theory of negligence, it suffers from a fatal flaw.  The plaintiff and his expert have not furnished evidence of an applicable standard of care, nor a deviation from it, regarding the inadvertent shooting of the wrong individual in response to a gunfire attack.  Plaintiff's expert attests that "if DeOnte Rawlings was armed and fired the shots at the subject officers they were justified in returning fire."  MSJ Opp. Ex. 4 ("Scott Affidavit"), at 1-2; see also id., Att. 1 ("Scott Report"), at 5 ("If Mr. Rawlings was armed with a gun and shot at Officer Haskel, the force used by Officer Haskel against Mr. Rawlings was necessary and objectively reasonable.  Officer Haskel's use of deadly force would be consistent with standard police practices and procedures.").  Plaintiff's expert simply does not discuss what standard of care would apply if a third person fired on Haskel and Haskel accidentally hit Rawlings while returning fire.  Instead, the bulk of the expert's report addresses alleged violations of police practices by Clay and Haskel before and after the shooting.  See Scott Report at 8-9, 11-12.  Where the report addresses the shooting itself, it speaks only to the question of whether Rawlings himself fired a gun, id. at 9-11, and what standards of behavior would govern if he did or did not have a gun, id. at 5-7.  Nor do the remainder of the plaintiff's filings and exhibits identify a standard of care applicable to the scenario discussed here.

27

Because the plaintiff has not identified a standard of care or presented any evidence of a deviation from that standard, summary judgment is warranted on this theory of liability.  See Smith v. District of Columbia, 882 A.2d 778, 793 (D.C. 2005) (finding directed verdict on negligence claim warranted where plaintiff failed to introduce expert testimony as to the applicable standard of care); Dormu v. District of Columbia, 2011 WL 2632330, at *13 (summary judgment is required on negligence claim where plaintiff's submissions fail to establish standard of care).

### 4.  Negligence Based on Failure to Prevent Another Officer's Assault (Clay)

If Haskel shot Rawlings without justification — an issue that will be determined at trial — then Clay, as a police officer, could potentially be held liable in negligence for failing to intervene on Rawlings's behalf.

Ordinarily, a police officer has no common law duty to protect any particular member of the public, and therefore officers are not liable for failing to render aid to specific individuals.  Morgan v. District of Columbia, 468 A.2d 1306, 1308, 1310 (D.C. 1983) (en banc). A narrow exception to this rule exists, however, where "a 'special relationship' exists between the police and a particular individual [that creates] a specific legal duty . . . rendering the police liable for failure to act."  Id. at 1312 (citing Warren v. District of Columbia, 444 A.2d 1, 3 (D.C. 1981)).  As the D.C. Court of Appeals has explained:

> Although the police have no obligation to act at the behest of any one individual, once they begin to act on behalf of a particular citizen in such a way as to raise significantly the quotient of risk over and above the risks assumed by every other member of the community, additional responsibilities arise.

Id. To find such a special relationship there must be: "(1) a specific undertaking to protect a particular individual, and (2) justifiable reliance by [that individual]." Id. at 1314; see also id. at 1315 ("Liability is established . . . if the police have specifically undertaken to protect a particular individual and the individual has specifically relied upon the undertaking.").

Applying a variant of this theory in Martin v. Malhoyt, 830 F.2d 237 (D.C. Cir. 1987), the D.C. Circuit addressed the question — never "squarely addressed by the District of Columbia courts" — "whether a law enforcement officer is answerable in damages for standing by and failing to protect a member of the public from an assault allegedly perpetrated by a fellow officer." Id. at 259. Based on Morgan and other precedent regarding "special relationships" between the police and members of the public, the court determined that in some limited circumstances officers can be liable in negligence for failing to prevent such an assault.

In Martin, a police officer allegedly dragged the plaintiff from her car during a traffic stop, struck her in the face, and handcuffed her while violently grinding her body and face onto the trunk of her car, all while a second officer stood idly by. The first officer then allegedly forced the plaintiff into his own car, dispersed onlookers, rolled up the car windows, and commenced repeatedly punching her. Martin v. Malhoyt, 830 F.2d at 242. Plaintiff sued. Among her claims was a negligence claim against the bystanding officer for failing to intervene on her behalf. Id. at 258. In concluding that the plaintiff had stated a cognizable negligence claim against the bystanding officer, the court first determined that the arresting officer's actions created a special relationship with the plaintiff:

> We think Officer Stover's "affirmative undertakings" — forcibly removing Stevens from her car, handcuffing her and placing her in police custody — sufficient to establish a "special relationship"

> between Stevens and the police. Once Stevens was denied, by
> Stover's actions, the most basic means of self-protection, the
> "quotient of risk" to which she was exposed rose significantly; the
> officers thus incurred an obligation to take reasonable steps to
> insure that the physical harm to which Stevens was vulnerable did
> not materialize.

Id. at 259.

Although the court in Martin relied primarily on Morgan for its holding, it did not discuss the second half of the "special relationship" test articulated in that opinion — "justifiable reliance, by the plaintiff, upon the actions of the police." Morgan v. District of Columbia, 468 A.2d at 1315; see also Savoy v. District of Columbia, No. 94-731, 1997 WL 122928, at *3-*4 (D.D.C. Mar. 11, 1997) (in order to establish a special relationship a plaintiff must demonstrate not only an affirmative undertaking by the police to protect the plaintiff but also that the plaintiff "justifiably relied upon the offered protection"). And despite finding that the plaintiff had stated a cognizable negligence claim, the court in Martin nevertheless dismissed her claim on the merits, finding that the facts did not support liability against the bystanding officer. Martin v. Malhoyt, 830 F.2d at 259-60; see also Masel v. Barrett, 707 F. Supp. 4, 7 (D.D.C. 1989) (discussing Martin but finding it inapplicable).

In this case, the plaintiff does not allege or present any evidence that Clay and Haskel apprehended Rawlings and then unjustifiably shot him. Rather, the plaintiff's contention is that Haskel shot Rawlings outright, either without any justification or while attempting to shoot another individual. Since the officers never had Rawlings within their control, they did not engage in the type of affirmative undertaking that would create the protective relationship to which the "special relationship" doctrine is geared.

It may seem counterintuitive that Clay could be liable in negligence if Haskel apprehended Rawlings before shooting him, but not if Haskel shot Rawlings outright without apprehending him.  This result, however, is a reflection of the fact that in the District of Columbia a police officer has no duty, as far as negligence liability is concerned, to prevent harm to any particular member of the public.  Only when police officers have already established a special relationship with an individual can an officer be held liable in negligence for failing to prevent harm to that individual.  The shooting cannot have simultaneously established a special relationship with Rawlings and violated that relationship.  To hold that a police officer is liable under common law negligence for failing to prevent another officer from committing any tort against a private citizen would represent an extension of <u>Martin</u> that the Court does not find consistent with the boundaries of the "special relationship" doctrine.[8]

### 5.  Negligence Based on Respondeat Superior (District of Columbia)

The District of Columbia is vicariously liable for the negligent acts of its officers acting within the scope of their employment.  <u>Evans-Reid v. District of Columbia</u>, 930 A.2d at 937.  The plaintiff, however, has not presented any viable negligence claims against Clay or Haskel that can survive summary judgment.  Therefore there is no basis on which the District can be held liable in negligence on the basis of respondeat superior.

--------

[8]    The requirement of a "special relationship" differentiates this common law negligence theory from the distinct concept of bystander liability under Section 1983.  The latter has different elements and requires no special relationship.  <u>See</u> <u>Fernandors v. District of Columbia</u>, 382 F. Supp. 2d 63, 72 (D.D.C. 2005) ("Under the bystander theory of liability an officer is held responsible for a constitutional violation if he: (1) knows that a fellow officer is violating an individual's constitutional right; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.") (citing <u>Randall v. Prince George's County</u>, 302 F.3d 188, 204 (4th Cir. 2002)).

6.  Negligence Based on Failure to Train or Supervise (District of Columbia)

To prevail on a negligent supervision claim at common law, a plaintiff must show that the employer "'knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee.'"  District of Columbia v. Tulin, 994 A.2d 788, 794 (D.C. 2010) (quoting Giles v. Shell Oil Corp., 487 A.2d 610, 613 (D.C.1985)).  A plaintiff claiming negligent supervision "bears the burden of presenting evidence which establishes the applicable standard of care, demonstrates that this standard has been violated, and develops a causal relationship between the violation and the harm complained of."  Tarpeh-Doe v. United States, 28 F.3d 120, 123 (D.C. Cir. 1994) (quoting Morrison v. MacNamara, 407 A.2d 555, 560 (D.C. 1979)).  In other words, the claim "requires proof that the employer breached a duty to plaintiff to use reasonable care in the supervision or retention of an employee which proximately caused harm to the plaintiff."  Phelan v. City of Mount Rainier, 805 A.2d 930, 940 (D.C. 2002).  The plaintiff must show that the employer's negligence was a "substantial factor" in causing the plaintiff's injury.  Kivanc v. Ramsey, 407 F. Supp. 2d at 274 (citing Tarpeh-Doe v. United States, 28 F.3d at 124).[9]

---

[9]        There has been some confusion about whether plaintiff's common law claim for negligent supervision is presented within Count III or Count VII of the complaint.  Count III, which presents claims for common law negligence, refers to the District of Columbia along with the individual defendants, but appears to assert only agency theories of liability.  See Complaint ¶¶ 26-29.  Count VII clearly alleges negligent training and supervision, but cites only 42 U.S.C. § 1983 as a basis for liability and exclusively discusses the "deliberate indifference" standard applicable to constitutional claims.  See Complaint ¶¶ 44-46.  Notwithstanding Count VII's exclusive reference to Section 1983, the defendants interpret that count as including plaintiff's common law negligent supervision claim.  See MSJ at 38 ("Count VII . . . alleges negligent training and supervision under both the § 1983 'deliberate indifference' standard . . . and ordinary negligence.").  When the plaintiff was given leave to amend Count V of his complaint, he also

Plaintiff's negligent supervision claim is clearly not viable in relation to any actions taken by Clay. Although plaintiff's expert attests that Clay violated police policies before and after the shooting, <u>see</u> Scott Affidavit at 4-5; Scott Report at 8-9, 11-12, neither this expert nor the plaintiff identifies any evidence suggesting that the Metropolitan Police Department knew or should have known that Clay was prone to behave in a dangerous or otherwise incompetent manner. Therefore the plaintiff's negligent supervision claim against the District of Columbia can proceed only with respect to the Metropolitan Police Department's supervision of Haskel.

To show that the Metropolitan Police Department was negligent in training and supervising Haskel, plaintiff must provide evidence that the Department knew or should have known that Haskel "behaved in a dangerous or otherwise incompetent manner" and nevertheless failed to adequately supervise him. <u>District of Columbia v. Tulin</u>, 994 A.2d at 794. Plaintiff must show, therefore, that Haskel engaged in behavior before the Rawlings shooting that should have put his employer on notice that he required additional training.

Plaintiff's expert on police practices offers his opinion that Haskel's involvement in two previous shootings while off-duty should have prompted an inquiry into whether he required additional training, even if those shootings were found to be justified, and that there is no record that Haskel ever received such attention. <u>See</u> Scott Affidavit at 3 (stating that even when a police shooting is found justified, "the officer's actions and adherence to all policies and

_____

(without authorization) inserted the words "Common Law" to the heading of Count VII.

The Court construes the complaint to allege negligent training as one of several negligence theories encompassed within Count III. The Court clarifies this issue only for the sake of precision: it is evident from the parties' filings and their comments at the motions hearing held on October 11, 2011, that both parties recognize the plaintiff has alleged negligent training and supervision under both the common law and Section 1983.

33

procedures must be properly scrutinized," and if the officer is found to have violated policy

during the shooting, "remedial and/or disciplinary action must be taken").  Further, the expert

avers that if Haskel had received proper guidance and remedial training following the earlier

shootings, "it is highly unlikely that he would have been involved in the Rawlings shooting."  Id.

at 3; see also Scott Report at 14 ("Had Officer Haskel been properly supervised prior to the

incident involving Mr. Rawlings it may have mitigated or prevented the death of Mr.

Rawlings.").

        Plaintiff's expert provides no support for his view that Haskel should have

received additional training after the two previous incidents, which took place more than eleven

years before the Rawlings incident, in 1995 and 1996.[10]  He notes that both shootings were

reviewed by the Metropolitan Police Department and were determined to be justified.  Scott

Report at 13-14.  The expert offers no reason to discredit these conclusions.  Nor does he explain

why the Department should have concluded that Haskel behaved in a dangerous or incompetent

manner in the past.  See District of Columbia v. Tulin, 994 A.2d at 794.  As the expert explains,

"Officer Haskel was found to be in compliance with MPD policy" during both incidents.  Scott

---

[10]    Plaintiff makes several statements about Haskel's prior shootings that are not
supported by the evidence he has submitted, or are contradicted by that evidence.  For instance,
plaintiff claims that both previous incidents "involved teenage males who were minors."  MSJ
Opp. at 17; id. at 6.  No evidence in plaintiff's filings supports that contention.  Plaintiff also
states that "in both previous instances, defendant Haskel shot at individuals who were running
away from him and who were supposedly armed but no weapon was found."  Id. at 6; see also id.
at 17.  According to the account provided by plaintiff's own expert, in the first incident a gun
was in fact recovered from the suspects.  See Scott Report at 13.  In the second incident, the
suspect escaped from the scene and was not apprehended until later, at an apartment complex, by
different officers.  Id.  Plaintiff further states that in both previous shootings "the injuries suffered
were gunshot wounds to the back," MSJ Opp. at 17, but no one suffered any injuries in the first
incident — Haskel shot at the suspect once and missed.  Scott Report at 13.

Report at 14.  The only potential violations of accepted police practices that the expert identifies

is that in the 1996 incident Haskel did not identify himself as a police officer (while pursuing a

suspect who had robbed him at gunpoint), and in the 1995 incident he claimed to have done so

but was not heard by the suspect (who ran past Haskel while fleeing from where he had fired

upon an occupied vehicle).  Id. at 13, 14.  In these circumstances, there is no probative evidence

before either the Court or the expert as to why the Metropolitan Police Department should have

been aware that Haskel needed additional training on the use of deadly force.  The plaintiff

therefore has failed to show that any duty of care was breached by the District of Columbia in

this regard, much less a causal relationship between any supposed breach and Rawlings' death.

See Phelan v. City of Mount Rainier, 805 A.2d at 940.

Plaintiff's expert also asserts that Haskel should have been provided with

psychological counseling from the MPD simply by virtue of being involved in a shooting.  See

Scott Affidavit at 3 ("[F]ollow-up psychological counseling is mandatory for an officer who has

been involved in any shooting incident"); Scott Report at 14; see also MSJ Opp. at 6 ("[T]he

District took no steps to provide . . . any counseling of any kind.").  Even assuming that the

District's failure to provide psychological counseling to Haskel after the earlier shootings

breached a duty of care, plaintiff must demonstrate that this breach was a "substantial factor" in

Rawlings's injury.  See Tarpeh-Doe v. United States, 28 F.3d at 124.  The only evidence plaintiff

has offered of this is his expert's opinion that if Haskel had been provided "proper guidance,

counseling, and remedial training following the shooting incidents in 1995 & 1996, it is highly

unlikely that he would have been involved in the Rawlings shooting."  Scott Affidavit at 4.  This

is pure speculation masquerading as an expert opinion.  "When an expert's testimony is based on

'guesswork, speculation or conjecture,' it should be excluded." <u>Kakeh v. United Planning Organization, Inc.</u>, 587 F. Supp. 2d 125, 130 (D.D.C. 2008) (quoting <u>Joy v. Bell Helicopter Textron, Inc.</u>, 999 F.2d 549, 568 (D.C. Cir. 1993). The bare assertion that if Haskel had received psychological counseling he might not have been involved in the Rawlings shooting eleven years later is not sufficient evidence upon which a jury could reasonably hold the District of Columbia liable for Rawlings's death.

Having provided no substantial evidence that the District of Columbia breached any duty of care in supervising Haskel that led to Rawlings's injuries, the plaintiff cannot proceed to trial on his common law claim for negligent training and supervision. Summary judgment will be granted.

### D.  Negligent Training and Supervision Under 42 U.S.C. § 1983 (Count VII)

The plaintiff has brought a claim for negligent training and supervision against the District of Columbia under Section 1983 as well as under the common law.[11] Different standards govern the two claims. "In order to hold a municipality liable for a civil rights violation under Section 1983, the municipality must have acted in accordance with a 'government policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" <u>Chen v. Monk</u>, 701 F. Supp. 2d 32, 37 (D.D.C. 2010) (quoting <u>Monell v. Dep't of Social Servs.</u>, 436 U.S. 658, 694 (1978)). A municipality's failure to train its officers

---

[11]     Although the Court denied without prejudice the defendants' summary judgment motion with respect to Count VII, pending review of the defendants' motion in limine addressing the claim, <u>see</u> <u>Rawlings v. District of Columbia</u>, Civil Action No. 07-1914, Minute Order (Oct. 11, 2011), the Court ultimately found it unnecessary to consult that motion in order rule on this claim.

or employees qualifies as a custom or policy that violates Section 1983 only when that failure

"'amounts to deliberate indifference' towards the constitutional rights of persons in its domain."

Kivanc v. Ramsey, 407 F. Supp. 2d at 278 (quoting Daskalea v. District of Columbia, 227 F.3d

433, 441 (D.C. Cir. 2000)). This standard is more demanding than that for common law

negligence. See Chen v. Monk, 701 F. Supp. 2d at 37.

Plaintiff and his expert have presented no evidence about any deficiency in the

District of Columbia's training of its police officers except in regard to one officer — defendant

Haskel. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten

liability on the city." City of Canton v. Harris, 489 U.S. 378, 390-91 (1989). Nor does it suffice

for the plaintiff to prove "that an injury or accident could have been avoided if an officer had had

better or more training, sufficient to equip him to avoid the particular injury-causing conduct."

Id. at 391. Plaintiff maintains, however, that the MPD's failure to provide Haskel with additional

training or counseling after the two prior shootings in which he was involved demonstrates

deliberate indifference on the part of the District toward the constitutional rights of individuals

who might come into contact with Haskel. See MSJ Opp. at 17-21.

Plaintiff's evidence falls short of the Monell standard and is not sufficient to

survive summary judgment. A policy or custom "must be pervasive to support municipal

liability." Tabb v. District of Columbia, 605 F. Supp. 2d 89, 96 (D.D.C. 2009) (citing Carter v.

District of Columbia, 795 F.2d 116, 123-24 (D.C. Cir. 1986)). Even if the negligent training of a

single police officer could establish municipal liability in an extraordinary case, the Court has

already determined that plaintiff has failed to provide significantly probative evidence that the

District of Columbia was negligent in its supervision of Haskel. See supra at 33-36. Without

37

demonstrating negligent supervision even in regard to this officer, plaintiff clearly has not demonstrated "a pervasive pattern of police officer indulgence in the use of excessive force, persisting in the District because of the MPD's tacit approval," <u>Carter v. District of Columbia</u>, 795 F.2d at 123, or that the "failure to supervise officers was systematic within the MPD such that it rose to the level of a policy." <u>Powers-Bunce v. District of Columbia</u>, 479 F. Supp. 2d 146, 155 (D.D.C. 2007).

Because the plaintiff has failed to provide evidence upon which a reasonable jury could find a policy of deliberate indifference toward unjustified police shootings on the part of the District of Columbia , plaintiff's negligent training and supervision claim under Section 1983 cannot survive summary judgment.

## IV.  CONCLUSION

For the foregoing reasons, the motion for summary judgment filed by Anthony Clay, James Haskel, and the District of Columbia was granted in part and denied in part by Order of October 27, 2011.  Judgment has been entered for the defendants with respect to the plaintiff's claim for assault and battery against defendant Clay, the plaintiff's claims for negligence against all defendants, and the plaintiff's claim for negligent training and supervision under common law and 42 U.S.C. § 1983 against the District of Columbia.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: October 28, 2011